UNITED STATES OF AMERICA *v.* HAMBURG–
  AMERIKANISCHE    PACKETFAHRT–ACTIEN
  GESELLSCHAFT.  .

HAMBURG–AMERIKANISCHE    PACKETFAHRT–
  ACTIEN   GESELLSCHAFT,   APPELLANTS,   *v.*
  UNITED STATES OF AMERICA.

APPEALS FROM THE DISTRICT COURT OF THE UNITED STATES
  FOR THE SOUTHERN DISTRICT OF NEW YORK.

Nos. 289, 332. Argued November 3, 4, 1915.—Decided January 10, 1916.

This court cannot pass upon questions which have, as an inevitable
  legal consequence of the European War now flagrant, become moot.
This court takes judicial notice of the European War and that its in-

evitable consequence has been to interrupt the steamship business between this country and Europe.

It is a rule of this court based on fundamental principles of public policy not to establish a rule for controlling predicted future conduct; and it will not decide a case, involving a combination alleged to be in violation of the Anti-Trust Act, which has become moot as a legal consequence of war, because of probability of its being recreated on the cessation of war. *California* v. *San Pablo R. R.*, 149 U. S. 308.

The power of this court cannot be enlarged or its duty affected in regard to the decision of a moot case by stipulation of parties or counsel.

Where a case to dissolve a combination alleged to be illegal under the Anti-Trust Act has become moot and this court has thus been prevented from deciding it upon the merits, and the court below decided against the Government, the course most consonant with justice is to reverse, with directions to dismiss the bill without prejudice to the Government in the future to assail any actual contract or combination deemed to offend the Anti-Trust Act.

216 Fed. Rep. 971, reversed.

THE facts, which involve the construction and application of the Sherman Anti-Trust Act of July 2, 1890 and the practice of this court in regard to cases which have become moot, and the effect of the legal consequence of war, are stated in the opinion.

*Mr. G. Carroll Todd*, Assistant to the Attorney General, with whom *Mr. Thurlow M. Gordon*, Special Assistant to the Attorney General, was on the brief for the United States.

*Mr. Charles P. Spooner*, with whom *Mr. John C. Spooner* and *Mr. James L. Bishop* were on the brief for Hamburg American Steamship Company.

*Mr. Lucius H. Beers*, with whom *Mr. Allan B. A. Bradley* was on the brief for Cunard Steamship Company and others.

*Mr. Charles C. Burlingham*, with whom *Mr. Roscoe H. Hupper* was on the brief for American Line and others.

*Mr. Joseph Larocque,* with whom *Mr. William G. Choate* and *Mr. Nelson Shipman* were on the brief, for North German Lloyd and others.

*Mr. Ralph James M. Bullowa* for defendants Johnson and Straus, agents of Russian East Asiatic Steamship Company, Ltd., submitted.

MR. CHIEF JUSTICE WHITE delivered the opinion of the court.

The United States on January 4, 1911, commenced this suit to prevent the further execution of an agreement to which the defendants were parties and which it was charged constituted the foundation of an illegal combination in violation of the Anti-Trust Act of July 2, 1890, (26 Stat. 209, c. 647). The relief asked moreover in the nature of things, embraced certain subsidiary agreements made during the course of the execution of the main contract in furtherance of its alleged prohibited result. The principal agreement was made in 1908 to last until February 28, 1911, but was to continue in force thereafter from year to year unless not later than December 1st of each year a notice of the intention not to continue was given. On December 3, 1910, however, just a month before this suit was filed, the agreement in question was renewed for a period of five years.

We give from the argument on behalf of the United States a statement of the corporate defendants to the bill, some of whom had become parties to the alleged illegal combination by subsidiary agreement or agreements made at a later date than the original contract.

1. "The Allan Line Steamship Company, Limited, hereafter called the 'Allan Line,' a British corporation, operating from Portland, Boston, and Philadelphia to London, Liverpool, and Glasgow and return.

2. "International Mercantile Marine Company, a New Jersey corporation, operating from New York and Philadelphia to Liverpool and Southampton and return.

3. "Its ships, together with those of its subsidiary company, defendant International Navigation Company, Limited, also operating from New York and Philadelphia to Liverpool and Southampton, . . . are referred to as the 'American Line.' Besides International Navigation Company, Limited, it also controls through stock ownership the defendants British and North Atlantic Steam Navigation Company, Limited, Societe Anonyme de Navigation Belge Americaine, and Oceanic Steam Navigation Company, Limited.

4. "British and North Atlantic Steam Navigation Company, Limited, a British corporation, hereafter called the 'Dominion Line,' operating from Portland to Liverpool and return.

5. "Societe Anonyme de Navigation Belge Americaine, a Belgian corporation, hereafter called the 'Red Star Line,' operating from New York and Philadelphia to Antwerp and return.

6. "Oceanic Steam Navigation Company, Limited, a British corporation, hereafter called the 'White Star Line,' operating from New York and Boston to Liverpool and Southampton and return.

7. "The Anchor Line (Henderson Brothers), Limited, a British corporation, hereafter called the 'Anchor Line,' operating from New York to Glasgow and return.

8. "Canadian Pacific Railway Company, a Canadian corporation, operating a regular line of steamships, hereafter called the 'Canadian Pacific Line,' from Montreal, Quebec, and St. John in the Dominion of Canada to Liverpool, England, and return. It also owns and operates a transcontinental railroad which, partly through branches running into the United States and partly through connections with the Wabash and other American railroads,

transports a substantial proportion (12%) of its steamship passengers to and from points in this country.

9. "The Cunard Steamship Company, Limited, a British corporation, hereafter called the 'Cunard Line,' operating from New York and Boston to Liverpool in England, Fiume in Hungary, and Trieste in Austria, and return.

10. "Hamburg-Amerikanische Packetfahrt-Actien Gesellschaft, a German corporation, hereafter called the 'Hamburg-American Line,' operating from New York to Hamburg and return.

11. "Nord Deutscher Lloyd, a German corporation, hereafter called the 'North German Lloyd Line,' operating from New York, Baltimore, and Galveston to Bremen and return.

12. "Nederlandsh-Amerikaansche Stoomvaart Maatschapij (Holland-Amerika Lijn), a Netherlands corporation, hereafter called the 'Holland-American Line,' operating between New York and Rotterdam and return.

13. "Russian East Asiatic Steamship Company, a Russian corporation, hereafter called the 'Russian-America Line,' operating between New York and Libau, Russia, and return."

The individuals named as defendants were the principal officers and agents in this country of the corporate defendants. We extract from the argument on behalf of the Government the following statement of the main provisions of the principal agreement.

"(1) The parties guarantee to each other certain definite percentages of the entire steerage traffic carried by them both eastbound and westbound between European ports and the United States and Canada, except Mediterranean passengers.

"(2) Any line exceeding its allotment must pay into the pool a compensation price of £4 for each excess passenger, which sum is to be paid proportionately to the line or lines

which have not carried their full quota. It is expressly stated that this provision 'forms one of the main features of the entire contract.'

"(3) Each line must make a weekly report of the number of steerage passengers carried, and from these the secretary of the pool compiles weekly statements showing the pool position of each line. He also prepares each month provisional accounts of the compensation due from lines which have exceeded their quota. This must be paid immediately on pain of heavy penalties. Final settlements are made at the end of each year.

"(4) Each line undertakes to arrange its rates and service in such manner that the number of steerage passengers it actually carries shall correspond as nearly as possible with the number allotted to it by the contract. If any line exceeds its proportion it is in duty bound to adopt measures calculated to bring about a correct adjustment. The other lines may either await the action of the individual line or a majority of the lines representing 75 per cent. of the pool shares can immediately order rates on a plus line to be raised or rates on a minus line to be lowered, and from this order there is no appeal. It is expressly stated, however, that 'all parties were unanimously of the opinion that the adjustment is, whenever practicable, to be effected not by reducing the rates of one Line but on the contrary by *raising* the rates of one or several of the Lines.

"(5) No line has the right to alter its steerage rates without having previously informed the secretary; i. e., all lines are bound to maintain existing rates until the other pool members are notified.

"(6) No circulars or publications shall be issued by any line reflecting upon or instituting comparisons with any other conference line unfavorable to the latter, and no party shall support (advertise in) any newspaper which shall systematically attack any conference line.

"(7) To insure the faithful performance of the agree-

ment, each line deposits with the secretary a promissory
note in the amount of £1,000 for each per cent. of traffic
allotted to it in the pool. From this amount penalties
may be collected ranging from £250 for smaller infractions
to the forfeiture of the entire deposit if the line withdraws
from the agreement before its expiration, refuses to pay
compensation money, or assists directly or indirectly any
opposition line.

"(8) New lines may be admitted or the terms of the
agreement altered only by unanimous vote, unless other-
wise provided in the contract.

"(9) To assist in the carrying out of the agreement a
Secretary was appointed.

"(10) Regular meetings are to be held alternately at
London and Cologne for the purpose of carrying out this
agreement and agreements collateral thereto. These
meetings constitute what is called The Atlantic Confer-
ence.

"Representatives of the Atlantic Conference Lines
likewise meet in New York in what is called the American
Atlantic Conference or New York Conference."

It is to be observed in addition that the agreement
expressly provided that the withdrawal of any one of the
lines from the contract should release all others from all
future obligation unless the others agreed among them-
selves to continue.

To the elucidation of the view we take of the case it
suffices to say that as the result of the answers of the
defendants the issues which arose for decision were two-
fold in character: Did the Anti-Trust Act relate to the
business of ocean transportation with which the assailed
agreement and those subsidiary to it were concerned; and
if so, did the agreements and the conduct of the defendants
under them, constitute a violation of the provisions of the
Anti-Trust Act?

The court below, although deciding that the ocean

transportation covered by the main agreement was under the control of the Anti-Trust Act, yet held that the assailed contract and the action of the parties under it were not within the terms of the act and therefore that the complaint of the Government on that subject was without foundation. The court, however, concluded that a certain subsidiary agreement which had been entered into in the process of the execution of the original agreement had given rise to a practice which was reprobated by the Anti-Trust Act and the further execution of such agreement and the carrying out of the practice under it were by the decree forbidden. The court reached these conclusions upon opinions formed concerning the nature and character of ocean transportation with which the agreement was concerned, the evils which had existed in the traffic and which it was the purpose of the agreement to remedy, the practice of the commercial world in dealing with such transportation in the past, the benefit which had resulted to commerce from the execution of the agreement, the reflex light thrown upon its intent and object by the reasonable rates which had been applied in its execution and many other conditions which had come to pass as a result of the agreement tending to the amelioration of the conditions of steerage travel and the resulting benefaction to the safety, comfort and health of the millions of human beings traveling by steerage, to which class of traffic alone the contract related. (216 Fed. Rep. 971.)

The contentions which presumably were urged in the court below and which it is deemed by the parties here arise for decision will at once appear by giving a brief statement concerning those made on this appeal by the United States and by the defendants as appellees or on a cross appeal. On behalf of the United States it is insisted that the provisions of the Anti-Trust Act govern the subject, that the terms of the agreement constitute a plain violation of that act, that the conduct of the parties under

it add additional force to the considerations arising from the text of the contract since it demonstrates that the purpose of the agreement was to destroy competition, to acquire dominion over rates and to fix them as the result of monopoly, and that it is wholly irrelevant to inquire whether in executing the wrongful powers which were acquired by the contract the parties were beneficent in their action, since what the act forbids is the monopoly and the combination for the purpose of obtaining monopoly and there is no distinction in the act between a good monopoly and a bad one. On the other hand, the contentions of the defendants are as follows: First, that conceding the power, it is not to be assumed, in the absence of express declaration to that effect, that the purpose of Congress in the Anti-Trust Act was to extend its authority into foreign countries to prevent the execution in such countries, of contracts which were there legal and which were intended, in view of the conditions there prevailing, to better enable the discharge by ocean carriers of their duty. Second, that it appears from subsequent legislation of Congress that it was not its intention to deal with ocean transportation from and to foreign countries by the Anti-Trust Act, since such transportation was dealt with in subsequent legislation in a manner which persuasively leads to such conclusion. Tariff Act of August 27, 1894, c. 349, §§ 73-77, 28 Stat. 509, 570; Tariff Act of July 24, 1897, c. 11, § 34, 30 Stat. 151, 213; Joint Resolution, September 19, 1914, No. 43, 38 Stat. 779. Third, that in fully investigating and considering the question whether ocean transportation to and from foreign countries was included in the Anti-Trust Act, in an elaborate report a committee of the House of Representatives had expressed conclusions in conflict with the view that the act did apply and had recommended the adoption of legislation to guard against evils in such traffic, if any, and which legislation, if adopted, would be in a large sense incompati-

ble with the conclusion that the Anti-Trust Act was applicable to such transportation.

While this mere outline shows the questions which are at issue and which would require to be considered if we had the right to decide the controversy, it at once further demonstrates that we may not, without disregarding our duty, pass upon them because of their absolute want of present actuality, that is, because of their now moot character as an inevitable legal consequence springing from the European war which is now flagrant—a matter of which we take judicial notice. *Montgomery* v. *United States*, 15 Wall. 395; *United States* v. *Lapène*, 17 Wall. 601; 7 Moore's International Law Digest, 244, 250. The legal proposition is not in substance controverted, but it is urged in view of the character of the questions and the possibility or probability that on the cessation of war the parties will resume or recreate their asserted illegal combination, we should now decide the controversies in order that by operation of the rule to be established any attempt at renewal of or creation of the combination in the future will be rendered impossible. But this merely upon a prophecy as to future conditions invokes the exercise of judicial power not to decide an existing controversy; but to establish a rule for controlling predicted future conduct, contrary to the elementary principle which was thus stated in *California* v. *San Pablo & Tulare R. R.*, 149 U. S. 308, 314: "The duty of this court, as of every judicial tribunal, is limited to determining rights of persons or of property, which are actually controverted in the particular case before it. When, in determining such rights, it becomes necessary to give an opinion upon a question of law, that opinion may have weight as a precedent for future decisions. But the court is not empowered to decide moot questions or abstract propositions, or to declare, for the government of future cases, principles or rules of law which cannot affect the result as to the thing in issue

in the case before it.   No stipulation of parties or counsel, whether in the case before the court or in any other case, can enlarge the power, or affect the duty, of the court in this regard."

See also *Lord* v. *Veazie*, 8 How. 251; *Cheong Ah Moy* v. *United States*, 113 U. S. 216; *Little* v. *Bowers*, 134 U. S. 547; *Jones* v. *Montague*, 194 U. S. 147; *Security Life Insurance Co.* v. *Prewitt*, 200 U. S. 446; *Richardson* v. *McChesney*, 218 U. S. 487; *Stearns* v. *Wood*, 236 U. S. 75.

Our attention has indeed been directed to a recent decision in *United States* v. *Prince Line, Limited*, 220 Fed. Rep. 230, where although it was recognized that "The combination against which this proceeding is directed, composed of two British and two German steamship companies, has been practically dissolved as a result of the European War," and the questions presented "have become largely academic," the court nevertheless proceeded to consider and dispose of the case on the merits, observing in conclusion, however: "In view of the fact that the logic of events has turned this investigation into an autopsy, instead of a determination of live issues it seems unnecessary to discuss the persuasiveness of the proofs," etc. But we cannot give our implied sanction to what was thus done or accept the persuasiveness of the reasoning upon which the action was based in view of the settled decisions of this court to the contrary and the fundamental principles of public policy upon which they are based.   In fact at this term, although we were pressed to take jurisdiction of a cause in a capital case after the death penalty had been inflicted on the accused, we declined to do so and dismissed for want of jurisdiction because the case had become a moot one.   *Director of Prisons* v. *Court of First Instance of the Province of Cavite, post*, p. 633.

Nor is there anything in *United States* v. *Trans-Missouri Freight Association*, 166 U. S. 290, and *Southern Pacific Terminal Co.* v. *Interstate Commerce Commission*, 219 U. S.

498, which conflicts with this fundamental doctrine.   In the first, the *Trans-Missouri Case,* a combination between railroads charged to be illegal was by consent dissolved and it was held that in view of the continued operation of the railroads and the relations between them their mere consent did not relieve of the duty to pass upon the pending charge of illegality under the statute of their previous conduct, since by the mere volition of the parties the combination could come into existence at any moment. Leaving aside some immaterial differences, in terms the ruling in the *Southern Pacific Case* was based upon the decision in the *Trans-Missouri Case.*   Here on the contrary the business in which the parties to the combination were engaged has by force of events beyond their control ceased and by the same power any continued relation concerning it between them has become unlawful and impossible.   The difference between this and the *Trans-Missouri Case* was clearly laid down in *Mills* v. *Green,* 159 U. S. 651, where after announcing the general rule as to the absence of authority to consider a mere moot question and referring to possible exceptions resulting from the fact that the want of actuality had arisen either from the consent of the parties or the action of a defendant, it was declared (p. 654): "But if the intervening event is owing to the plaintiff's own act or to a power beyond the control of either party, the court will stay its hand."

Although it thus follows that there are no issues on the merits before us which we have a right to decide, it yet remains to be determined what our order should be with reference to the decree below rendered, which as we have seen was against the Government and in favor of the assailed combination because it was found not to be within the prohibitions of the Anti-Trust Act.   As established by the ruling in *South Spring Hill Gold Co.* v. *Amador Gold Co.,* 145 U. S. 300, our conclusion on such subject must be reached without at all considering the merits of the cause

and must be based solely upon determining what will be "most consonant to justice" in view of the conditions and circumstances of the particular case. Coming to consider the question in that light and in view of the nature and character of the conditions which have caused the case to become moot, we are of opinion that the ends of justice exact that the judgment below should not be permitted to stand when without any fault of the Government there is no power to review it upon the merits, but that it should be reversed and the case be remanded to the court below with directions to dismiss the bill without prejudice to the right of the Government in the future to assail any actual contract or combination deemed to offend against the Anti-Trust Act.

*And it is so ordered.*

MR. JUSTICE McREYNOLDS took no part in the consideration or decision of these cases.