UNITED STATES v. PAN-AMERICAN COMMISSION et al.

(District Court, S. D. New York. August 8, 1918.)

No. 14/79.

1. ACTION ⬡➤6—GROUNDS FOR DISMISSAL; "MOOT CASE."

That equity case is "moot" in which no decree consistent with both pleadings and existing facts will benefit any party as against the other parties to the litigation.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Moot Case.]

2. EQUITY ⬡➤388—MOTION TO DISMISS; PRESUMPTION OF TRUTH OF ALLEGATIONS OF BILL.

Where, prior to hearing of a motion to dismiss, complainant has put in all its evidence taken for final hearing and rested, allegations of the bill are to be taken as true on the motion only so far as sustained by complainant's evidence.

3. EQUITY ⬡➤388—GROUNDS FOR DISMISSAL; MOOT CASE.

Where, prior to suit by the government to dissolve an alleged illegal combination in restraint of trade, the parties had become hostile toward each other, one party had repudiated the agreement, which had never been carried into effect for any illegal purpose, and it was afterward abrogated by mutual consent, the case *held* moot and dismissed.

In Equity. Suit by the United States against the Pan-American Commission and others. On motion to dismiss bill. Motion granted.

This cause having by consent of parties and consequent direction of the court been set for final hearing on July 29, 1918, the defendants Pan-American Commission, Wexler, and Dinkins moved on July 26th to dismiss the bill as to them on the ground that since January 2, 1918, "the question" sought to be raised in this litigation has become altogether "moot"; there being at present "no subject-matter upon which the judgment of this court can operate." On July 29th, this motion having been brought on to be heard, defendants Reguladora, Marin, and Ferraez joined therein. Defendant Martinez did not appear.

The moving papers on the motion consisted of the joint affidavit of Wexler and Dinkins, verified July 26th, and the exhibits thereto attached. To this evidence the plaintiff "demurred" in open court, and asked leave to offer the evidence taken in support of the bill, both for that purport, and to induce denial of motion. Leave so to do having been granted, plaintiff put in all the evidence taken by deposition, and rested.

⬡➤For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The original moving defendants then "for convenience" took all their testimony and rested. The other defendants present (who had joined in the motion to dismiss) obtained adjournment of trial until August 16th; it being understood that, if bill be not by that date dismissed on motion, a day would then be set for the production of their evidence.

Joseph M. Cox, of Washington, D. C., and John E. Walker, of New York City, for the United States.

Levy Mayer, of Chicago, Ill., and Charles C. Deming, of New York City, for defendants Pan-American Commission and others.

Nelson S. Spencer and Otto C. Wierum, Jr., both of New York City, for defendants Reguladora and others.

HOUGH, Circuit Judge. The decisions, most of them recent, filed by the Supreme Court, on motions to dismiss in form like the one at bar, or on the suggestion of the court itself, must be all harmonious (that is, rest on the same logical foundation), because that tribunal continually so treats them; yet I find great difficulty in finding the principle applicable to facts of course slightly differing from anything ruled on by the highest court.

In Hamburg-American Case, 239 U. S. 466, 36 Sup. Ct. 212, 60 L. Ed. 387, the general principle seems to be stated by quoting from Mills v. Green, 159 U. S. 651, 16 Sup. Ct. 132, 40 L. Ed. 293, viz. that only when the "intervening event is owing to the plaintiff's own act or to a power beyond the control of either party, the court will stay its hand." Comparing this announcement with the exact point ruled in the Trans-Missouri Case, 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007, it seems plain enough that the mere dissolution of the defendant Pan-American Company would not render the case moot.

But evidently the moving papers in this case were drawn with an eye to the latter decision; it is here plainly averred that this dissolution partly resulted from and had "connection with the pending case," and Wexler and Dinkins do "allege a purpose not to enter again into a similar arrangement," all of which elements were lacking in the Trans-Missouri dissolution, and such significant omissions were (semble) made grounds of ruling by Peckham, J. (166 U. S. 308, 17 Sup. Ct. 546, 41 L. Ed. 1007), who finally justified retention of ·cause by saying that "the relief granted should be adequate to the occasion."

What, then, is the vital distinction leading to differing results, in the Trans-Missouri and Hamburg-American decisions? Plainly the European War, which in the latter case not only made united action among the defendants impossible and unlawful, but in plain language made them hate each other. This was a cause beyond the control of any party. But it has also been laid down, supra, that the intervening cause which is to hold the hand of the court must be (if not exterior and superior force) the act of the plaintiff. But in Berry v. Davis, 242 U. S. 468, 37 Sup. Ct. 208, 61 L. Ed. 441, and Directors, etc., v. Court, etc., 239 U. S. 633, 36 Sup. Ct. 220, 60 L. Ed. 478, as explained in same volume (239 U. S. at page 466, 36 Sup. Ct. 212, 60 L. Ed. 387), the intervening act was plainly that of defendants.

In the first case the action was in substance against the state of Iowa

to restrain enforcement of an allegedly unconstitutional statute; the suit was aborted by repeal of the statute. In the second the object was to restrain fulfillment of a sentence of death, on the ground of some illegality in judicial procedure, execution pendente lite made the case moot. Yet dissolution of a corporation is legal death, and the difference between executions and felo de se for moot purposes remains to be explained.

Doubtless, also, there is a real distinction between private litigation between nonofficial persons, and suits wherein (as put in plaintiff's brief) "the public interest is involved" (Trans-Missouri Case, 166 U. S. 309, 17 Sup. Ct. 546, 41 L. Ed. 1007); yet I fail to see how the public interest can be more directly involved than in the lawful and constitutional administration of the criminal law. Nor is it plain why the "public interest" of a state in such a matter as taxation is any the less to be regarded than that of the United States as representing its citizens in respect of trusts or combinations. But see California v. San Pablo, etc., R. R., 149 U. S. 308, 13 Sup. Ct. 876, 37 L. Ed. 747.

The conclusion to which I come, and came before I ever heard of this litigation, is that there is no verbal touchstone, no hard and fast rule, by which motions such as this can be disposed of.

[1] That equity case is "moot" in which no decree consistent with both pleadings and existing facts will benefit any party as against the other parties to the litigation. The San Pablo Case, supra, illustrates this. There was on that appeal a real question as to taxing power generally, but there was no existing contest between the parties. In the Trans-Missouri Case, on the other hand, the name by which the cause is known was not even corporate; it was a partnership style under which the defendants of record had chosen to do business in an obnoxious way. Said defendants dropped the name, but continued the way.

The foregoing is not an attempt to define—that is, to state the limits of meaning for—the word "moot"; it is only an illustration of meaning, which seems sufficient for present purposes. Therefore I turn to the record to ascertain what can be done in this month of August, 1918, under a bill filed January 20, 1917.

[2] The fundamental position assumed by the United States at this point is that "for the purposes of this motion the combination alleged is to be regarded as illegal." This is usually true, where the only facts before the court are those in the moving and answering affidavits. But here plaintiff elected to put in all the evidence it had procured for the final hearing of July 29th, and to "rest." So far as the government is concerned, it has advanced its whole cause; and it would be a refinement of technicality to consider for any purpose the combination alleged as anything more than or different from what the plaintiff's own evidence shows it to be.

In considering this record, stuffed with irrelevancies and of almost unbelievable prolixity, I have not deemed as plaintiff's evidence anything not (in my opinion) fairly cross-examination on matters sworn to on direct. But I have considered it proper to regard as evidence anything relevant elicited by any moving defendant, when evidently

treating a deponent as his own witness, and have, of course, received the depositions and oral evidence offered by the Pan-American Company, Wexler, and Dinkins at the hearing.

[3] From the record, so regarded, I find that the Reguladora is not, and was not when bill filed, a voluntary association of farmers or planters, producing and wishing to sell through a common agency henequin or sisal; but it is and then was another name for, or means of enforcing the power of, Gen. Alvarado, the substantial dictator under Gen. Carranza of the state of Yucatan. To it all sisal growers are, and were at time of bill filed, compelled to deliver their product, receiving therefor or thereupon advances, which may or may not be the whole price they receive. Their ultimate net depends not so much on the terms of their contract as on elements political and fiscal, which cannot be called proven.

Before November, 1915, this forcible political or military monopoly did not exist, but the Reguladora did; it was one of the buyers of sisal, and by no means the most influential; it lacked the means to make advances to sisal growers—at all events in attractive amounts. In that month of November, 1915, two things happened: Gen. Alvarado by proclamation substantially required universal delivery of sisal to the Reguladora, and the agreement complained of was made between the then United States manager of the Reguladora, Rendon, and Wexler and Dinkins as second parties.

For purposes of suit, that agreement speaks from February 16, 1916, when (and before any business had been done under it) it was modified. By the modified agreement, the Reguladora could borrow, on pledged sisal warehoused in this country, at 6 per cent. up to $10,000,000 at any one time, and on each bale up to 60 per cent. of the market, but not over $^{36}/_{10}$ cents per pound—the lenders to get also $1.12½ per bale commission, with a guaranteed minimum borrowing on 400,000 bales per annum for five years; this last in consideration of the promise to keep or get $10,000,000, available if wanted, whether actually wanted or not.

But one loan was ever asked or made; this in summer of 1916. The Rendon who made the contract fell from favor, was superseded as United States manager, and remained in this country for reasons interestingly divulged in the evidence, but which seem to me quite immaterial. Then the Reguladora repudiated Rendon's action, and has in this suit denied throughout that any binding and lawful contract (under the law either of this country or Mexico) was ever made. Having ceased to do business with Wexler and Dinkins, or their company (the Pan-American), it also refused to pay the guaranteed minimum commission, but finally, and after this suit was begun, settled threatened litigation over the matter; Wexler & Dinkins getting, all told, about two years' commissions for their five years' contract, which was then formally abrogated.

The Reguladora has raised the price of sisal to about three times what it was when contract made, and the relations between the two sets of persons said to be conspirators by this bill is, and has been since before this action began, distinctly hostile.

Admittedly the only way of reaching this foreign monopoly is to find some private resident persons who have combined and confederated with it to raise the price of the monopolized articles in the United States, and committed in furtherance of that object an overt act in the United States. This at least is the argument now made under, the Wilson Tariff Act (Act Aug. 27, 1894, c. 349, 28 Stat. 509) as amended.

Let it be assumed that in 1915 there was a conspiracy—i. e., an agreement to work together—to raise prices. There is positive disproof that any such conspiracy, or any meeting of minds of any kind, now exists, or did exist when this bill was filed. Nor humanly speaking can there ever hereafter be any combination between these two sets of defendants.

It follows that any decree that could now be entered would and could only declare that several years ago certain parties made an unlawful contract, which one promptly repudiated, and which has been either fully executed or nullified, according to the contention accepted; and, having thus labeled a corpse, the decree would solemnly restrain every defendant from doing again what they have violently quarreled over, because it was once done. If this is not a moot point, the meaning of that ancient phrase has escaped me; to make decree would be exactly that "autopsy" which this court performed in the Prince Line litigation and was reproved for by the Supreme Court.

But, as indicated above, there is before me a mass of evidence, and I am assured it is the "government's case." The original moving defendants have also introduced their evidence. Without waiting for the testimony of the Reguladora party, there is enough at hand to test the intent of Wexler and Dinkins in doing what they confessedly did.

It is held as too plain for argument that the paper writings evidencing the ultimate contractual relations of the Reguladora (as represented by Rendon) and Wexler et al. do not per se prove any unlawful intent, or any intent other than one to make money by charging a reasonable rate for a large service.

Every pound of sisal was or might be burdened with a loan or charge that may be stated thus: 3.6 cents plus 112.5 cents, divided by 375 equals the Pan-American Company's maximum interest in every or any pound of that to which the alleged conspiracy relates. Having regard to sisal prices before or since Reguladora formation, such a charge or burden could not in its nature affect the price at all.

The claim of conspiracy rests on one of two propositions; at least I can discover no other even suggested by the government. Either any one who lends money to a monopolist becomes a partner or conspirator with him by the act of loan, or the conspiracy depends on some spiritual or sympathetic emotion actuating the loan.

The first proposition is not, I apprehend, relied on, and is bad law anyhow. As to the second, it seems to me no more than a decent regard for citizens accused of wrongdoing to record my opinion that this record contains no evidence whatever of any sympathy with or desire to assist anybody who wished to raise the price of sisal in the United States over November, 1915, price, on the part of Messrs. Wexler and Dinkins.

It is natural to inquire, why and how did the price-raising efforts of the Reguladora succeed? Here, as was done by the Supreme Court, we can and must take judicial notice of the present war, and its more notorious results. Not much judicial notice need be taken, for the evidence shows the movement and use of manilla hemp, which is what really controls the price of sisal. The inferior fiber must find its own level, with reference to manilla prices and supply.

In my opinion the one thing (except Alvarado's iron hand) that has put up the price of sisal is the lack of shipping to move manilla and the enormous demand for manilla for marine rope. This is just as much the result of a war, of *the* war in which *we* are now engaged, as the situations recognized as "staying the hand of the court," in the cases first above cited.

Motion granted, and bill dismissed without prejudice.