**UNITED STATES v. NORTHERN PAC. RY. CO. et al.**

(District Court, E. D. Washington, N. D. February 21, 1927.)

No. 4286.

1. **Carriers** ⬥⬥32(2)—**Settlement and payment of damage claims for elevation of tracks by railroad company held not device to indirectly grant concessions in freight rates (Elkins Act [Comp. St. §§ 8597–8599]).**

A railroad company was required by city ordinance to elevate its tracks from 12 to 15 feet to avoid grade crossings, and manufacturers and other shippers in interstate commerce, who had built plants with reference to the old grade, some on ground leased from the company and some not, made claims for damages because of the change. On advice of competent counsel that it was probably liable for damages, the company compromised and settled all claims, paying as much as $50,000 to one claimant, who was not a lessee. Held that, under such facts, the settlements could not be considered a device to indirectly grant concessions on freight rates to its tenants, in violation of Elkins Act (Comp. St. §§ 8597–8599).

2. **Carriers** ⬥⬥34—**Court held without jurisdiction to grant injunctive relief against alleged discrimination in rates arising out of contracts which had terminated (Elkins Act, § 3 [Comp. St. 8599]).**

A railroad company leased sites on its unoccupied right of way for buildings to be erected by manufacturers and others who were shippers in interstate commerce. The leases were for long terms, the rentals being based on a valuation of the ground, and provided for revaluation at the end of 10 years and at intervals of five years thereafter. Held that, after the 10 years had expired or was about to expire, and before any revaluations had been made, the United States could not maintain a suit against the company and certain of its tenants under Elkins Act, § 3 (Comp. St. § 8599), to compel discontinuance of the granting of concessions in rates to the tenants, and discrimination against other shippers, alleged to arise from the device of leasing at substantially less than fair and reasonable rentals; the court being without jurisdiction to grant relief with respect to the 10-year period which had passed, or to direct what future rentals shall be.

3. **Action** ⬥⬥6—**Courts may decide existing controversies only.**

It is the function of courts to decide existing controversies, not to lay down rules for the guidance of litigants in their future conduct and dealings.

In Equity. Suit by the United States against the Northern Pacific Railway Company and others. Decree dismissing bill.

William J. Donovan, Asst. Atty. Gen., Elmer B. Collins, Sp. Asst. Atty. Gen., Claude De S. Thomas, Sp. Asst. U. S. Atty., and Roy C. Fox, U. S. Atty., of Spokane, Wash.

Edward J. Cannon and Francis J. McKevitt, both of Spokane, Wash., for Northern Pacific Railway Co.

Graves, Kizer & Graves, of Spokane, Wash., for March-Strickle Motor Co., Bessinger & Co., Pacific Hide & Fur Depot, Inc., D. H. Anderson & Co., Charles Uhden, Inc., Nott-Atwater Co., Washington Electric Supply Co., Powell-Sanders Co., Mitchell-Lewis & Staver Co., Kelley-Clarke Co., Hughes & Co., Crane Co., A. L. Rogers Seed Co., Spokane Dry Goods Co., Nash-Spokane Co., Pacific Transfer Co., and McClintock-Trunkey Co.

Williams & Cornelius, of Spokane, Wash., for Advance Rumely Thresher Co.

E. H. Belden, of Spokane, Wash., and C. H. Browder, of Chicago, Ill., for International Harvester Co.

J. D. Campbell, of Spokane, Wash., for Fairbanks-Morse Co.

WEBSTER, District Judge. The Northern Pacific Railway Company, by succession in interest, owns and operates a government land grant railroad, which was constructed through the then village of Spokane Falls in 1882 and 1883. The growth and development of the city of Spokane have been largely around and along its right of way, until at this time the geographical center of the city is but one block, and the retail business center but two blocks, removed from the tracks of the company. Its lines extend through the very heart of the city. The company holds under legal restrictions a large amount of nonoperating property situated along and adjacent to its tracks in the city of Spokane; the particular parcels involved in this case being located between Washington street on the east and Cedar street on the west. For many years it has been the policy and practice of the railway company to lease these lands for industrial, wholesale, warehouse, jobbing and other similar purposes to individuals or concerns handling large freight shipments.

This suit was brought by the United States under the Act of Congress of February 19, 1903, as amended, commonly known as the Elkins Act (Comp. St. §§ 8597–8599), against the railway company and 21 of these lessees, for the purpose of enjoining the railway company from granting and the respondent lessees from receiving concessions, advantages, and discriminations in respect to the transportation of property in interstate commerce, and also to enjoin the company from granting discriminations in favor of the respondent lessees, to the prejudice and disadvantage of other shippers in interstate commerce over its lines. Some of the shippers who are alleged to be thus discriminated against are likewise lessees of right of way lands of the railway company, and for convenience these will be referred to as "other lessees." The concessions, advantages and discriminations complained of are alleged to arise out of the device of leasing to the respondent shippers their respective lots or parcels of land at rentals substantially less than their fair and reasonable rental values. In addition to the injunctive relief sought, it is prayed that these leases be cancelled and held for naught.

As originally constructed through the now city of Spokane, the tracks of the railway company crossed the intersecting streets and thoroughfares at grade, and this condition of things continued till 1912, when the city of Spokane passed an ordinance requiring the railway company to elevate its main and connecting side tracks from Division street on the east to Sixth avenue on the west, including the district in question, so as to separate the grade of the railroad from the grade of the intersecting streets. In compliance with this ordinance the tracks within the designated territory were raised approximately 15 to 18 feet above the level of the streets, which now pass under the elevated tracks. This work was completed early in 1916. The leases granted by the railway company covered only the naked ground, and many of its lessees, prior to grade separation, had constructed valuable and extensive improvements on the leased premises, the improvements being made with reference to the original track level. The elevating of the tracks pursuant to the city ordinance made it necessary for these lessees to rearrange or reconstruct their buildings, so as to accommodate them to the radically changed physical situation. For example, it was no longer possible to receive and discharge freight on the first floors of the buildings, but the structures had to be altered so as to handle freight on the second floors, to the level of which, and beyond, in some instances, the tracks had been elevated.

These changes were fraught with untold problems and perplexities, and in addition to the original cost entailed the permanent inconvenience and expense of handling shipments, especially heavy articles, in this unnatural way. In effecting grade separation, the tracks were not only elevated vertically, but for practical reasons of economy to the railway company were moved horizontally or laterally from their original location at grade, thus removing them a greater distance from the buildings erected on the leased premises and which they were intended to serve. In some instances lessees were compelled to build ramps or chutes to span the increased space between their buildings and the tracks in order to load and unload freight. That the elevation of the tracks militated greatly against the desirability of the leased lands for the purposes for which they were being used cannot be seriously doubted. To meet this new order of things the leases in effect before grade separation were surrendered for cancellation, and in their stead new leases were negotiated and executed. These are the leases now under attack.

Under the terms of the leases the respondents have constructed or purchased from prior

lessees their own buildings on the lots. The lessees undertake to pay as annual rental in advance a sum equal to 6 per centum of the value of the demised land, but this value is agreed upon in each case and stipulated in the lease. In addition, the lessees pay all taxes and assessments, both general and special, levied against the premises. The leases are terminable by the railway company upon six months' notice, but in the event of such termination it must purchase from the lessees all their improvements and pay therefor their actual value, not to exceed the cost of reproduction new less depreciation. In some instances, as in the case of the International Harvester Company, a maximum value is fixed beyond which the company shall not be required to pay in any event. The leases are for long periods, varying from 15 to 50 years, and it is stipulated that the premises shall be used for a specified purpose only, and lessees shall not permit the premises to be used or occupied for any other purpose without the lessor's written permission. The lessees further agree not to sublet the property or assign the leases without the written approval of the lessor. The leases contain what is commonly called a routing clause, providing in effect that, rates being as favorable as those accorded by other carriers, the lessees will do all transportation business to and from the leased premises over the lines of the Northern Pacific Company. The rentals stipulated in the leases are for the first 10 years, and it is provided that, for the purpose of determining the rental after the first 10-year period and at the end of each 5-year period thereafter, there shall be a revaluation of the premises. If the parties are unable to agree upon such revaluation, the same shall be fixed by appraisers chosen in the manner stated in the leases.

The government contends that the railway company, in leasing its lands to the respondents at a rental substantially less than their fair and reasonable rental value thereby grants unlawful concessions and advantages to the lessees because they are shippers of property in interstate commerce over its lines of railroad, the amount of the concession or advantage being the difference between the rentals actually received by the railway company and the fair rental value which it should exact and receive. With respect to the "other lessees" it contends that they are discriminated against by the railway company because the values placed by it on their holdings are upon a much higher level than the values fixed in the leases of the respondents. In addition, complaint is made of certain cash payments or settlements made by the railway company to some of the latter class of lessees.

[1] Before taking up the question of inadequate rentals, it seems convenient first to consider these cash payments. The government insists that the payments were in fact voluntary concessions granted by the railway company to the lessees receiving them, and were inspired solely by traffic considerations, whilst the railway company contends that the payments were made in compromise and settlement of damage claims arising out of grade separation which were asserted by the claimants in good faith, and recognized in part by the railway company on the advice of competent counsel. In support of its contention the government relies principally upon a letter written by the railway company's land commissioner and upon certain other letters written by some of its local agents which, if they stood alone and unexplained, would warrant the conclusion that the payments complained of were made with the view and for the purpose of retaining and controlling the traffic of those to whom the payments were made.

This correspondence shows that the land commissioner at all times denied liability to any lessee on account of grade separation, and that the traffic agents enthusiastically urged payment because of fear of losing the business of these shippers. On the other hand, however, it appears from the testimony that, with the permission of the railway company's general counsel, Mr. Frank H. Graves was employed as special counsel to assist Mr. Cannon, the regular local counsel, in legal matters arising out of and pertaining to grade separation. With reference to the claims of lessees for damages because of grade separation, Mr. Cannon testified:

"In the meantime we were working somewhere in here in the district in controversy in this case, and our opinion was asked as to what liability we were under to the occupants of our property, and we looked that up pretty thoroughly. My conclusions possibly did not on all occasions agree with Mr. Graves' conclusions; but, as far as that is concerned, we were both of the opinion these shippers might collect damages from us if they started action. We had had sufficient troubles already, and we wanted to avoid expensive litigation. We concluded to deny liability, but to watch carefully, and, if a man became dangerous, we adjusted with him, if we could, in the best way we knew how."

He further testified that all the settlements complained of were made upon his advice, in which Mr. Graves concurred. The Holley-

Mason Hardware Company was paid $50,000 in settlement of its claim for damages on account of elevating the tracks. This company was not a lessee of the railway company, and the payment could not possibly have been made as an unlawful concession in virtue of a lease. In addition to this, a large amount was paid out to other damage claimants under similar circumstances. If a nonlessee may assert and collect claims for damages arising out of grade separation, it is not perceived why lessees may not do likewise. To be sure, if the claims asserted by the respondents were groundless, and were employed for the purpose of enabling them to receive a concession or rebate under the guise of collecting a claim for damages, all payments made under such a subterfuge would be under the condemnation of the statute; but if the claims asserted were meritorious, or if they were at least doubtful and were pressed in good faith, and the company in recognizing them did so pursuant to the advice of competent counsel that in all reasonable probability the claims were enforceable, and the payments were made in good faith in liquidation of this probable liability, then obviously no statute would be violated.

The only possible bearing that the relationship of landlord and tenant could have in respect of these settlements would be to require the transaction to be carefully scrutinized, because of the fact that the lessor was an interstate common carrier and the lessee was a shipper of property over its lines. That the respondents were in fact damaged by track elevation is not open to question. The point involved was whether the railway company was answerable for this damage. The record discloses that the claims were asserted by the lessees in good faith, and in some instances upon advice of counsel. There is nothing in the amounts of these payments to excite suspicion. The claims arose out of a novel and unusual situation. Large expenditures were made in settlement of similar claims to nonlessees, which cannot be accounted for upon the basis of traffic considerations. The claimants believed their demands were enforceable. The railway company had been advised by competent counsel that in their opinion the company was liable, and the settlements complained of were made pursuant to such advice.

These controlling aspects of the transaction, in my judgment, are not overborne because the company's land commissioner made denial of liability on the part of the company, nor by the fact that over-enthusiastic traffic agents made importunate appeals to the company for settlement because of fear of losing the claimants' traffic. In view of the nature and extent of the claims arising out of grade separation, it was hardly to be expected that the railway company would make public acknowledgment of liability, and, whatever considerations may have prompted the traffic agents in their efforts to "make good" in their department, the fact remains that the company did consider itself liable, and that the settlements were made because of that fact. In the light of these considerations, I am convinced that, upon the record, it is not permissible to say that these settlements sounded in fraud and bad faith, or that they were made use of as a subterfuge, through the mediumship of which rebates or concessions might be granted by the railway company to shippers under the guise of the payment of damage claims, and thereby to evade the inhibitions of the Elkins Law. It hardly seems believable that, if the railway company had been inspired by any such purpose in making the settlements, it would have sought the opinion of special counsel concerning the validity and enforceability of the claims.

It goes without saying that there is no suspicion of bad faith in the opinions given the railway company by the counsel employed to investigate the matter. It would serve no useful purpose to descend to an analysis of the details pertaining to these claims separately. It will suffice to say that, for the reasons already indicated, I conclude that the payments were not in contravention of law. Moreover, these payments were made many years ago, and it is not apparent what relief could be granted against them in this proceeding, no matter what view might be entertained concerning their validity or propriety. In their reply brief, counsel for the government seem to recognize this difficulty, for they say: "The purpose of the government in submitting proof concerning the payment of concessions during the period from 1916 to 1923 was merely to demonstrate the necessity for an injunction."

[2] I come now to the question of the unreasonableness of the rentals reserved in the leases upon which are based the claims both of concessions and discriminations. As I have already stated, the leases of the respondents provide for a revaluation of the leased premises at the expiration of 10 years from their respective dates, and at 5-year periods thereafter. The 10-year period under all the leases save one—that of Mitchell-Lewis & Staver Company—has expired, some a short time before this suit was commenced, and many others during its pendency. At this time all the leases here involved but one are ripe for re-

valuation. In consequence of this, counsel for the lessees contend that the rental question is now moot. They insist it would be vain and idle for the court to declare that rentals in the past have been too low, that such a declaration could not be carried into judgment, that the court in this proceeding is without jurisdiction to adjudge what the future rents shall be, and that if, after revaluation, the government is still of the opinion that the rentals are too low, another proceeding will be necessary to determine that question.

The claimed vice in the leases does not inhere in the leases themselves, but arises solely out of the amount of rent reserved. There is nothing unlawful in the transactions, provided the lessee pays and the railway company receives adequate compensation for the use and occupation of the demised lands. The whole matter is pivoted upon the question of whether the rents reserved in the leases are reasonable or unreasonable. Assuming for the nonce that the rents in the past have been too low, no injunctive decree now can alter or remedy that situation, for the simple reason that past occurrences and events are not subject to preventive measures. As aptly said by Judge Philips in United States v. Atchison, Topeka & Santa Fé Railway Co. (C. C.) 142 F. 176, 186:

"It is inconceivable that the court could have intended to say that under the Elkins Act an injunction could be had for a past violation of the interstate commerce law, not being repeated at the time of granting the injunction under the Elkins Act. Otherwise it would be violative of rules of law deeply rooted in the jurisprudence of the country. An injunction never goes to restrain a past act, already accomplished. It acts alone upon a wrong in fieri."

If, on revaluation, rentals are fixed which do not contravene the statute, the entire basis of this suit will be removed, and the evil leveled at will cease to exist. Granting the power to cancel the leases in their entirety, which, to say the least, is doubtful, what useful purpose would be accomplished by its exercise? New leases undoubtedly could be executed, and, if the rents agreed upon were fair and reasonable, the leases would not be vulnerable to attack under the Elkins Act. On the other hand, if the rentals were unreasonable, a new proceeding would be necessary.

[3] Obviously the court may not in this case determine in advance what the rentals shall be for the ensuing 5-year period. An attempt to do this would not involve the exercise of judicial power. It is the function of courts to decide existing controversies, not to lay down rules for the guidance of litigants as to their future conduct and dealings.

In Mills v. Green, 159 U. S. 651, 653, 16 S. Ct. 132, 133, 40 L. Ed. 293, Mr. Justice Gray writing, it is said: "The duty of this court, as of every other judicial tribunal, is to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it."

In United States v. Hamburg, etc., Co., 239 U. S. 466, 36 S. Ct. 212, 60 L. Ed. 387, the government commenced a suit to prevent the further execution of certain agreements to which the defendants therein were parties and which, it was charged, constituted an illegal combination in violation of the Anti-Trust Act (Comp. St. § 8820 et seq.). After holding that, because of the European war, the contracts in legal consequence were not operative, and that the questions presented were therefore lacking in actuality, the court, speaking through Mr. Chief Justice White, said:

"The legal proposition is not in substance controverted, but it is urged, in view of the character of the questions and the possibility or probability that, on the cessation of war, the parties will resume or recreate their asserted illegal combination, we should now decide the controversies in order that by operation of the rule to be established any attempt at renewal of or creation of the combination in the future will be rendered impossible. But this merely upon a prophecy as to future conditions invokes the exercise of judicial power not to decide an existing controversy, but to establish a rule for controlling predicted future conduct, contrary to the elementary principle which was thus stated in California v. San Pablo & T. R. Co., 149 U. S. 308, 314, 13 S. Ct. 876, 37 L. Ed. 747, 748. 'The duty of this court, as of every judicial tribunal, is limited to determining rights of persons or of property which are actually controverted in the particular case before it. When, in determining such rights, it becomes necessary to give an opinion upon a question of law, that opinion may have weight as a precedent for future decisions. But the court is not empowered to decide moot questions or abstract propositions, or to declare, for the government of future cases, principles or rules of law which cannot affect the result as to the thing in issue in the case before it.'"

Furthermore, I do not see how any principles of law could be laid down in this case which would be controlling or helpful in the matter of revaluing the premises for rental purposes. The reasonableness of the rents involves questions of fact rather than of law. It seems perfectly plain that, if a common carrier, in making a lease to a shipper of interstate commerce over its lines of railroad, because of traffic considerations, agrees upon a rent which is substantially less than the fair rental value of the premises covered by the lease, such an arrangement amounts to the granting of a concession or an advantage to the shipper in respect to the transportation of property in interstate commerce; the extent of the concession or advantage being the difference between the agreed rental and the fair and reasonable rental value of the property. The necessary and inevitable effect of such a transaction is to grant such favoritism, and it is wholly immaterial what were the intentions of the parties, or either of them, in that regard. It is likewise evident, as said by the Interstate Commerce Commission In the Matter of Leases and Grants of Property by Carriers to Shippers, 73 Interst. Com. Com'n R. 671, 683, wherein the very leases involved in this case were under review, that "every effort should be made by carriers to obtain, when leasing land to shippers, terms no less favorable than would be obtained, under similar conditions and restrictions of use, were the land owned independently of the railroad." In that case, however, the difficulties of effective public supervision in the premises were recognized as being quite obvious.

The leases of the respondents have many features in common, but they differ materially in important details having direct bearing on the reasonableness of the rentals reserved, and each case will have to be considered separately in the light of its own peculiar facts. It is not possible to consider the leases en bloc and determine the reasonableness of rentals in any general or abstract way. The revaluation of the lands will be the basis of rentals to be paid during the ensuing 5-year period, and consequently will involve a myriad of elements and factors. Waiving the question of power, it would not be possible, on the data submitted in this case, to determine such future rentals. The question of mootness is not discussed in the briefs of counsel for the government, and I therefore do not have the benefit of their views in this regard. I appreciate that the question is a difficult one, and is not free from doubt; but in the light of the foregoing considerations and authorities

I am constrained to hold that the contention of the lessees in this respect is sound—that, the time for revaluation having arrived, the question of the reasonableness of the rentals stipulated in the leases is lacking in actuality as an existing matter in controversy. It is moot and academic.

If, however, I am in error in this conclusion, it seems plain that the arrival of time for revaluation is a most important fact, to be given due weight and consideration in determining what action is just and equitable in the premises, especially in view of the conditions brought about by grade separation. That traffic considerations played a part in the negotiation of the assailed leases seems reasonably certain. The routing clause alone is convincing evidence of this fact. On the other hand, it seems equally clear that grade separation and its attendant problems likewise entered into the matter, and this at a time when the relative rights and duties of the railway company and its lessees, arising out of track elevation, were in an indefinite and uncertain status. It is quite impossible to know the comparative influence which these two factors had in the negotiation of the leases. There is no evidence in the record tending to show that the prior leases, which were in effect before grade separation, were unreasonable with respect to rentals. The fear of liability on the part of the railway company for damages claimed by many of the lessees, because of track elevation reflected itself in the new leases, which were executed because of the change thus brought about. Mr. Cannon testified that, when grade separation became an assured fact, he went to Chicago and Indianapolis, where tracks had been elevated some years before, for the purpose of making a thorough investigation and survey of the situation as it existed in those cities. Among others, he consulted at length with lessees and shippers whose warehouses were located along the elevated tracks. In this connection he testified:

"I learned in Indianapolis and Chicago something that I did not tell the tenants, and that was, the longer they operated on elevated tracks, the more dissatisfied they became; in other words, there was a continuing damage all the time where tracks are elevated, and goods taken in on the second floor. The only bearing that had with me was this: It was one of the reasons I urged Mr. Cooper that these parties be given at least 10 years, where their investments were considerable, in which to readjust themselves and work out the situation, so at the end of 10 years we would

know how the rentals should be readjusted. As to these other men, with less investment, I thought it would take less time in ascertaining the expense they would be put to. * * * I had told them to be careful and adjust; I didn't tell them the method of adjustment; whether it should be taken out in rentals, or whether be paid directly as a portion of the improvements, I did not advise."

He was then asked: "Now, with reference to giving all these leases along the space in litigation, these new leases, was that one of the methods of adjusting with all of them?" In answer he said: "Yes; and that was the best weapon we had. May I suggest in those days it was thought by the shippers up there that Spokane was rapidly growing, and that inducement would be of great value to them before the time came on for readjustment." It is not to be presumed that revaluation will be unduly delayed. Such a course would amount to manifest bad faith on the part of both lessor and lessees.

With respect to the contention that the so-called "other lessees" are discriminated against, because of the unequal valuation placed upon the property of these shippers as compared with the respondents' lands, I may say that the leases of the "other lessees" are either of recent origin or they provide a revaluation period of 5 years from the beginning, instead of an initial 10-year period, as in the case of the respondents. It also appears that uniformly upon the expiration of these 5-year periods the rentals of these tenants have been increased. Since there has been no opportunity for revaluation under respondents' leases until just now, this disparity is easily accounted for. If, upon revaluation under the respondents' leases, a higher rental is fixed, such action may very easily, not only dispose of the question that the rentals reserved are unreasonably low, but also the question that there is discrimination as between the two classes of lessees. The government concedes that the leases under attack are not unlawful merely because of the routing clause. In fact, the same clause is found in all the leases of the so-called "other lessees," and no effort is made to cancel their leases. On the contrary, their rights are recognized, and it is claimed that they are the victims of unlawful favoritism granted to the respondents.

Because of the foregoing considerations and in view of the conditions and circumstances of the case, it seems most consonant with justice and equity that this suit be dismissed, but without prejudice to the right of

18 F.(2d)—20

the government, if it is so advised, to institute a new proceeding after revaluation has been accomplished under the leases now ready for such action, or to institute such new proceeding after the expiration of a reasonable time for revaluation, whether revaluation has been accomplished or not.

Decree accordingly.