### STANTON et al. v. COMMISSIONER OF INTERNAL REVENUE.

No. 6060.

Circuit Court of Appeals, Seventh Circuit.

July 28, 1938.

Herbert Pope and Benjamin M. Price, both of Chicago, Ill., for petitioners.

James W. Morris, Asst. Atty. Gen., and Sewall Key and Warren F. Wattles, Sp. Assts. to Atty. Gen., for respondent.

Before SPARKS and TREANOR, Circuit Judges, and LINDLEY, District Judge.

SPARKS, Circuit Judge.

This petition for review of a decision of the Board of Tax Appeals raises the question of the year in which a gain was realized from the exchange of certain securities by petitioners' decedent. The Board found that the exchange took place in 1924 rather than in 1923 as claimed by petitioners, hence the transaction must be taxed according to the law in effect for the year 1924. Petitioners are the executors of the estate of the taxpayer, George C. Rew, who died June 10, 1924.

We state the facts as found by the Board. In 1923, decedent was the owner of a block of 6,150 shares of the preferred stock of the Calumet Baking Company, having a cost base of $57,370, which he knew were to be retired in January, 1924, for approximately $650,000. He consulted counsel to determine whether there was any way of avoiding the payment of the large income tax which might result from the transaction. He was advised that if the stock were exchanged for securities which had no "readily realizable market value," the transaction would be non-taxable under the Revenue Act of 1921, applicable to income of 1923. On December 31, 1923, he endeavored to effect such an exchange, but since the day was practically a holiday it was impossible to work out all the details of the exchange. In contemplation of it, however, he endorsed and delivered to a firm of investment bankers, hereafter referred to as Peabody, his certificates for the shares in Calumet, and Peabody signed an agreement pertaining to the exchange. This agreement which had been prepared by decedent's attorney provided that "Rew agrees to exchange the shares of stock" for "certain securities detailed in the attached schedule designated as 'Schedule A.'" The original schedule could not be located at the time of the hearing, nor was a copy available, but the evidence as to its contents indicated that it contained block designations of approximately thirty different kinds or issues of bonds which Rew would accept in exchange for his stock, "'a general designation to be later superseded by details as to numbers and maturity and amounts.'" In order to secure the performance of its part of the agreement to deliver to decedent blocks of securities which would yield a 7% return on his investment, Peabody Company further agreed to transfer to decedent's account for safekeeping with it, three blocks of bonds having an aggregate par value of $678,500. This was shown on its books as having been done, but in fact, the bonds were not physically set aside for decedent, and no bonds were actually deposited in safekeeping for him on that date or at any time prior to January 15, 1924, although Peabody did have in its inventory an amount of each of the bonds in excess of the amounts it agreed to deposit in safekeeping. The transaction was entered on the books of Peabody as an exchange on December 31, 1923, of decedent's certificate for three blocks of bonds, and the stock was listed among its assets in its inventory as of that date. But it was understood that decedent was not to retain those bonds but was to return them when he received the bonds originally contemplated.

The preferred stock of Calumet was called for retirement January 15, 1924. Meantime, the certificate had not been surrendered for transfer on the books of the company, hence the check for $650,000 to cover the retirement, and a second check for $10,762 for accrued dividends were issued to decedent on January 15, 1924, and he thereupon endorsed both to Peabody. On that same date, Peabody wrote decedent as follows: "We take from you the following bonds: (listing the three blocks it had agreed to hold in his name as security)" and "in exchange for same we give you certain other bonds as listed on following pages (listing the thirty blocks of bonds then delivered to decedent)." On that date, Peabody entered a sales voucher in its records showing on its books for the first time the transfer to decedent of the

thirty securities, *most* of which were also shown in the schedule attached to the agreement of December 31, 1923. The securities shown in the sales voucher had a fair market value on January 15, 1924, of $660,272, including accrued interest. The communication of January 15, 1924, listed bond numbers for the three blocks Peabody had agreed on December 31 to hold for decedent and Peabody stated it was taking on January 15. Approximately one hundred bonds bearing the same numbers had been sold by Peabody in fifty-one separate transactions between December 31 and January 15. The record did not disclose whether decedent kept his books on the cash or on the accrual basis. From these facts the Board found that the decedent realized a taxable gain in 1924 amounting to the difference between $660,272 (the value of the securities received) and $68,-132 (the cost basis of the stock exchanged plus the amount of the check for dividends).

After filing their petition for review of the decision of the Board of Tax Appeals, petitioners filed a motion to reverse the decision and direct the Board to dismiss the proceeding, without prejudice, on the ground that the proceeding is moot, for the reason that at no time during its pendency has there been any property in decedent's estate with which to pay the tax deficiency assessed. It appears that prior to his death, decedent created trusts to which he transferred practically all of his property, and that transferee proceedings are now pending against those trusts. Petitioners urge that the proceedings against them as executors must fail for the reason that there was never in the estate sufficient funds to pay the deficiency or any part of it, that income taxes admittedly due the United States exceeded the assets of the estate which consisted only of $41,194 cash, all of which was used in paying taxes and administration expenses. In support of their contention, petitioners rely on United States v. Anchor Coal Co., 279 U.S. 812, 49 S.Ct. 262, 73 L.Ed. 971 and United States v. Hamburg-Amerikanische, etc., Co., 239 U.S. 466, 36 S.Ct. 212, 60 L. Ed. 387. Both of these cases involved injunctions preventing action by governmental agencies, and in each it developed upon appeal that the issues presented had become moot. It was held that under these circumstances the proper procedure was to reverse the injunctional decree and remand the cause with directions to dismiss the bill. It will readily be seen that neither is authority for the proposition that the proceedings in the case at bar have become moot. We are cited to no authority for the proposition that the absence of assets in an estate against which a claim is being pressed is ipso facto ground for the dismissal of the proceeding against the executors. It does not appear of record that the decedent's estate had been closed and the executors discharged prior to the institution of these proceedings. The motion to dismiss is overruled.

Petitioners' second proposition is that the taxable gain, if any, was realized in 1923, and accordingly there was no deficiency for 1924, the only year for which a deficiency was claimed by the Commissioner. In support of this they cite the group of cases set out in the margin.[1] Many of these cases were considered by the Board which said of them, and other cases there cited: "Most of them involve sales of property in which the subject matter was sufficiently specified and identified and the purchase price agreed upon in the years in which the sales were held to be completed for tax purposes. In determining the question presented, this Board, and the courts took into consideration the time when the dominion, control, burdens and benefits of ownership passed to the purchasers, and the methods of accounting used by the taxpayers. The cases cited are in our opinion distinguishable from the instant case on their facts, and do not support petitioners' conclusion that the exchange here involved was consummated on December 31, 1933." We agree with this analysis of the cases and find it equally applicable to additional cases cited to this court. We think that the most that can be said of them is that where the terms of a sale are complete, the fact of non-delivery of the subject matter of the sale does not prevent the sale from taking

[1] Dahlinger v. Commissioner, 3 Cir., 51 F.2d 662; Commissioner v. Moir, 7 Cir., 45 F.2d 356; Hoffman v. Commissioner, 2 Cir., 71 F.2d 929; Fordyce v. Helvering, 64 App.D.C. 181, 76 F.2d 431; Brunton v. Commissioner, 9 Cir., 42 F.2d 81; Eavenson v. Commissioner, 3 Cir., 51 F.2d 664; Lucas v. North Texas Lumber Co., 281 U.S. 11, 50 S.Ct. 184, 74 L.Ed. 668; Huntington National Bank v. Commissioner, 6 Cir., 90 F.2d 876.

effect if it were the intention of the parties that it was to take place as of a certain date. This, we think, does not mean that a taxpayer may, by hastily divesting himself of title to property and taking in exchange a pledge to carry out an agreement to deliver in exchange an undetermined number of securities to be chosen later from a list which was in fact itself subsequently changed, evade tax liability for the year in which the terms of the exchange were actually arrived at and carried out.

The decision of the Board is affirmed.