GOODYEAR TIRE & RUBBER CO. v.
FEDERAL TRADE COMMISSION.
No. 7369.

Circuit Court of Appeals, Sixth Circuit.
Feb. 16, 1939.

HAMILTON, Circuit Judge, dissenting.

Grover Higgins, of Cleveland, Ohio (Newton D. Baker, Grover Higgins, and H. Chapman Rose, all of Cleveland, Ohio, on the brief), for petitioner.

P. B. Morehouse and E. F. Haycraft, both of Washington, D. C. (W. T. Kelley, Martin A. Morrison, Everett F. Haycraft, Pgad B. Morehouse, and James W. Nichol, all of Washington, D. C., on the brief), for respondent.

Before HICKS, SIMONS, and HAMILTON, Circuit Judges.

SIMONS, Circuit Judge.

The cease and desist order sought to be reviewed charges the petitioner with violation of § 2 of the Clayton Act, 15 U.S.C.A. § 13, by discriminating in the price of tires between those sold in interstate commerce to Sears, Roebuck & Company on the one hand and to dealers on the other, with the effect of lessening competition and tending to create a monopoly in their manufacture and distribution.

The case is here for the second time. At the first hearing, upon learning that the offending practices of the petitioner which led to the order had been discontinued under compulsion of the amendment to § 2 of the Clayton Act made on June 19, 1936, by the Robinson-Patman Act, U.S.C.A. Title 15, § 13, and with complete comprehension of the rule that discontinuance of a condemned practice constituting a violation of the act does not render a controversy moot where the offender by the mere exercise of volition may resume them, United States v. Trans-Missouri Freight Ass'n, 166 U.S. 290, 309, 310, 17 S.Ct. 540, 41 L.Ed. 1007, and other cases, yet conceiving ourselves bound by the decision and reasoning in United States v. Hamburg-Amerikanische, etc., 239 U.S. 466, 36 S.Ct. 212, 60 L.Ed. 387, and by the analogy of present circumstances to those there adjudicated and the relief there granted, held the controversy moot, set aside the order, and remanded the case, but without direction to dismiss the complaint and without prejudice to the filing of a supplemental complaint under the amended law. Goodyear Tire & Rubber Co. v. Federal Trade Commission, 6 Cir., 92 F.2d 677. Neither side supporting our view, the Supreme Court, without indicating departure from the rule announced in the Hamburg-Amerikanische case, without pointing to aught inapposite in our analogy or citing the reference, reversed. Federal Trade Commission v. Goodyear Tire & Rubber Co., 304 U.S. 257, 58 S.Ct. 863, 82 L.Ed. 1326. Upon its remand the cause is before us for decision upon the merits after full reargument.

As indicated in our former opinion, the controversy involves principally an interpretation given by the Commission to § 2 of the Clayton Act. That section declares it to be unlawful to discriminate in price between purchasers of commodities where the effect of such discrimination may be to substantially lessen competition or tend to create a monopoly in any line of commerce, subject to the proviso: "That nothing herein contained shall prevent discrimination in price between purchasers of commodities on account of differences in the grade, quality, or quantity of the commodity sold, or that makes only due allowance for difference in the cost of selling or transportation, or discrimination in price in the same or different communities made in good faith to meet competition." The petitioner contends that a discrimination in price is permitted if based upon the quantity of the commodity sold, without respect to whether it makes only due allowance for difference in cost of selling or transportation. The Commission contends that while the proviso permits discrimination on account of differences in quantity, such discrimination is not permitted unless reasonably related to and approximately no more than the difference in cost, and that a price discrimination is contrary to § 2 unless it can be shown that it represents and fairly approximates lower costs.

Prior to 1926 the large mail order house of Sears, Roebuck & Company, with

retail stores in many cities of the United States, bought its tires from one or more small manufacturers. Though doing a much larger general business than its principal competitor, Montgomery, Ward & Company, its tire business failed to keep pace with that of the latter. It set about to improve this condition by changing the personnel of its tire department and inaugurating a vigorous advertising campaign, and sought Goodyear as a source of tire supply. Its first contract with Goodyear in 1926 covered its requirements for a period of three years. The price was cost of manufacture plus a profit of 6%, later adjusted in some instances to 6½%. Sears was to do its own advertising and to sell the tires under trade-names of its own. In May, 1928, a second contract was concluded covering requirements to December 31, 1932, but terminable on that date by a year of advance notice. In the summer of 1931 Sears, signifying its intention to terminate, a new arrangement was made by which a ten year contract was entered into upon Goodyear paying to Sears a consideration in cash and common stock amounting to $1,250,000. Like preceding arrangements, the contract called for a price of cost plus profit.

Under its several contracts with Sears, Goodyear manufactured and sold to Sears during the eight-year period, 1926–1933, more than 19,000,000 tires, for which Sears paid to it a gross sum of $129,252,-984, and a net sum of $116,359,367. The Commission made an exhaustive study of the cost of tires sold by Goodyear under the Sears contracts and that of tires sold to its independent dealers upon a similar volume of business. It found that based upon the profit and loss statement of Goodyear adjusted as the result of such study, Goodyear realized on its sales to Sears during the entire period a total net profit of $7,715,794.56, and on its sales of equal volume to service-station dealers a net profit of $20,425,807.21. The difference of $12,710,012.65 in net profit it found to be the aggregate net price discrimination not accounted for by differences in cost of transportation and selling according to the respondent's own calculations and based upon the method which it itself suggested. It concluded that this price discrimination in favor of Sears against independent service-station dealers was not justified by differences in cost of transportation or selling. Conceding that quantity discounts are exempt because they involve some economic utility that should be preserved, the Commission asserts that the quantity exception does not permit price discrimination without limit or restraint, that while a difference in quantity of the commodity sold must be given reasonable weight in determining whether the discriminatory price is warranted, yet in arriving at a price on account of quantity it is necessary that the difference in price be reasonably related to the difference in cost, though remote and unsubstantial differences in cost may be disregarded.

The petitioner, conceding that price discrimination on account of quantity does not mean discrimination without limit, denies that such discrimination must be based on difference in cost or be reasonably related to such difference. It points to the value to Goodyear of the Sears requirements in removing hazard and insuring stability, the avoidance of profit fluctuation inevitable in its other business, and the casting upon Sears of the risk which Goodyear normally bore of raw material price decline and credit losses. It asserts that these advantages, over and above mere savings in costs, are substantial and real, even though they may not readily be measured in terms of dollars, and that the statute by its language permits a discrimination that will measure economic advantage of quantity sales beyond mere savings in cost.

The Commission dismissed from its consideration all intangible economic advantages of quantity sales over and above savings in cost as being too speculative and remote to justify price discrimination. Accepting the finding that the $12,000,000 difference in profit between tires sold to Sears and an equal volume of business with independent dealers measures its discount in excess of savings, the petitioner points out that this discrimination amounts to but 6.96% of the gross price to Sears. The Commission's counsel, however, contends that this calculation is erroneous, in that the profit differential should be related not to the gross selling price of tires to Sears but to the cost of their manufacture, and that so computed the discrimination not accounted for by savings is 11.89%. So it is argued on the one hand that the discrimination on account of quantity is reasonably related to the economic advantages of quantity sales in the volume made to Sears and on the other that discrimination on account of quantity even if

permitted by the statute is too great to be so related.

Primary consideration must necessarily be given to the meaning of § 2 of the Clayton Act. It will be observed that by the proviso, nothing contained in the section is to prevent discrimination in price between purchasers of commodities (1) "on account of differences in the grade, quality, or quantity of the commodity sold," or (2) "that makes only due allowance for difference in the cost of selling or transportation," or (3) "discrimination in price in the same or different communities made in good faith to meet competition." With the third exception of the proviso we are not concerned, and as to the meaning of the second exception there is no dispute. It is conceded that there may be a discrimination in price based upon quantity, but the Commission would read the second exception as a limitation or qualification of the first. We see no warrant for such construction and the structure of the proviso as well as the history of the section repel it.

 The three exceptions of the proviso would seem to be mutually exclusive. If the second qualifies and limits the first, the word "quantity" in the first exception appears to be redundant. Mindful of the rule that statements in debate are of doubtful aid to the construction of the statute, yet when there is common agreement throughout the consideration of legislation such agreement may properly be considered in determining its purpose. Federal Trade Commission v. Raladam Co., 283 U.S. 643, 650, 51 S.Ct. 587, 75 L.Ed. 1324, 79 A.L.R. 1191; Humphrey's Executor v. United States, 295 U.S. 602, 624, 55 S.Ct. 869, 79 L.Ed. 1611. The history of § 2 of the Clayton Act, both before and after its passage, its subsequent amendment by the Robinson-Patman Act, so that the phrase dealing with differences in quantity reads, "That nothing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered," point with greater than usual persuasiveness not only to its original purpose but to subsequently discovered infirmities, in the light of matured views upon the necessity of further regulation.

In its report of the Clayton Bill to the House of Representatives, the House Judiciary Committee made it clear that its primary purpose was to reach the practice of destroying competition in certain sections by lowering prices below cost and thereafter recouping such losses at the expense of the general public when monopoly had been achieved. The Senate Committee adopted the report (Cong.Record, Vol. 51, p. 15857). In the House it was pointed out by Mr. Webb in charge of the bill (ibid, p. 9072), that the practice of giving a cheaper rate to the purchaser who buys in wholesale lots was a business necessity that the Committee did not feel warranted in trying to disturb. When it was objected that this would allow great mail order houses to buy in enormous quantities and so to retain the great advantages they had always had, it was suggested that a section be drawn to correct that evil, but no such amendment was incorporated in the Act. The Clayton Act was passed in 1914, but until the present investigation began the Commission never assumed it had the power to prohibit price discrimination on account of quantity when unrelated to differences in cost. In 1928 Senate Resolution 224 directed the Commission to undertake an inquiry into the chain store system of marketing and distribution. Its final report was filed December 14, 1934 (Senate Document No. 4, 74th Congress, first session). In it the Commission indicated that lower selling prices were a very substantial if not the chief factor in the growth of chain store merchandising, and specifically discussing § 2 of the Clayton Act (p. 97), said: "That unless the price discrimination permitted 'on account of' quantity shall make 'only due allowance' therefore, § 2 of the Clayton Act may be readily evaded by making a small difference in quantity the occasion for a large difference in price. If the section is to have any vitality it must either be interpreted and enforced to that effect or it should be amended to that effect."

In its annual report for the year ending June 30, 1935, the Commission recommended the enactment of a law forbidding a seller "to discriminate unfairly or unjustly in price between different purchasers" or else a law "to clearly define the discrimination in price intended to be forbidden." Quite promptly bills were concurrently introduced into the House and Senate, each of which eliminated the pro-

viso of the old § 2 and substituted the language we have already recited. The two bills were consolidated under the style of the Robinson-Patman Bill, and as consolidated enacted into law June, 1936, with amended § 2 unchanged. In reporting the bill, the House Judiciary Committee (Report 2287, 74th Congress, second session), said: "* * * present § 2 of the Clayton Act places no limit upon quantity differentials of any kind. * * * This proviso is of great importance for * * * it also limits the use of quantity price differentials to the sphere of actual cost differences. * * * In the above exemption the phrase 'which makes only due allowance' is carried over from the present Act, but as coupled with the remainder of the clause, is here extended to limit quantity differentials to differences in cost of manufacture, sale and delivery as provided in said sub-section 2." In the report of the Senate Judiciary Committee (1502), it was said, "The weakness of present § 2 lies principally in the fact that (1) it places no limit upon differentials permissible on account of differences in quantity. * * *"

■ We defer to the rule that when the meaning of an Act of Congress is plain on its face there is no occasion to resort to the reports of Congressional Committees concerning it, Standard Fashion Co. v. Magrane-Houston Co., 258 U.S. 346, 42 S.Ct. 360, 66 L.Ed. 653, and it seems to be clear that § 2 of the Clayton Act permits discrimination in price on account of quantity without relation to savings in cost, and that the distinguishing phraseology employed in the two exceptions must not be ignored. But if in the light of the Commission's own change of view as to its meaning we assume it to be necessary to resort to extrinsic aid to ascertain it, it is made clear by the declaration of the several Committees of the Congress and the history of the section, that the amendment incorporated in the Robinson-Patman Act marks a change in the law and not mere clarification. So concluding we deem the order of the respondent erroneous insofar as it is necessarily based upon a construction of the law, which limits discriminations in price on account of quantity to approximate savings in cost.

We do not find anything in the case of American Can Co. v. Ladoga Canning Co., 7 Cir., 44 F.2d 763, to conflict with this view. There was in that case direct and substantial evidence that the discriminations there involved were not in good faith made on account of differences in quantity, and that the contention that they were so made was an afterthought first conceived when the case went to trial. There is no such factual situation here.

■ The Commission's counsel insist that even though the Commission is wrong in its construction of § 2, it found as a fact that the excess differential of $12,000,000 on tires sold to Sears over the price to independent dealers on a similar volume of business was not on account of quantity, and that this finding is based upon substantial evidence and so conclusive upon us. The contention requires analysis. We may say at once that it is not a sufficient answer to say, as does the petitioner, that Mr. Litchfield of the Goodyear Company testified that such differential was in good faith made on account of quantity after detailed consideration of the survey and report of experts, and his testimony stands unimpeached, for as we have frequently said, the persuasiveness of evidence may upon occasion be destroyed by analysis even though uncontroverted.

■ It is urged that the finding that excess discrimination was not on account of quantity is supported by evidentiary facts, including the fact that prices did not vary according to the varying volume of the Sears business, that there was no quantity commitment in the Sears' contracts, and that the discrimination was proportionally greater than that allowed dealers in view of the economic principle that at some point saturation must be reached beyond which no increase in quantity would justify an increase in discount. These evidentiary circumstances do not of themselves, however, sustain an ultimate finding that the differential was not on account of quantity. The lack of a definite commitment when the contract was for Sears' entire requirements, less minor checking orders, the failure of the price to rise and fall concurrently with the rise and fall of quantity shipments, and the lack of relation between the discount to Sears and the gradations of discount to independent dealers, are all inherent in the nature of a cost-plus agreement of such unusual volume as was expected to and did result from the Sears business, for the evidence discloses that it was from thirteen to thirty-six times the volume of that of Goodyear's largest independent customer.

All this aside, however, it seems perfectly clear that the findings and conclusions of the Commission that the discrimination in price was not on account of quantity, were all based upon the Commission's interpretation of the law. This permeated all of its discussion and controlled its evidentiary findings and its ultimate conclusions. Section 17 of the Commission's findings dealing with the present question is a composite of evidentiary facts, reasoning and conclusion. Without denying that there are economic advantages in dealing with a large customer on the basis of hazard, the stabilizing of production and profit and other factors not translated into dollar and cents advantage, it is determined without pretense of appraising such advantages that they are too speculative, intangible and remote to justify a price discrimination. It is further determined that the discrimination was not a quantity discount as customarily understood in the trade, because the Commission, weighing the testimony of expert economists pro and con, concluded that quantity discounts not justified on approximate savings are in that field considered as a form of price cutting, and so condemned by the law. The conclusion is inescapable that any discrimination in price exceeding by more than a negligible amount a due allowance for differences in cost must have brought about the same result. The Commission found no standard in the law by which a discrimination on account of quantity unrelated to savings in cost is to be judged. There is therefore no finding that the petitioner's differential, whether it be 6.96% or a greater percentage, is not on account of quantity because such discrimination is not permitted and may not be judged by a non-existent standard. Once a discrimination is found unrelated to savings in cost, it is ipso facto to be, condemned. So is there not only a misconstruction of the law, but a refusal to recognize a standard of judgment not based on such misconstruction and so impossibility of its application to the facts, if rightly construed.

Applicable in this connection is the language of the court in the Raladam Company case, supra: "Official powers cannot be extended beyond the terms and necessary implications of the grant. If broader powers be desirable, they must be conferred by Congress. They cannot be merely assumed by administrative officers; nor can they be created by the courts in the proper exercise of their judicial functions." [283 U.S. 643, 51 S.Ct. 590.] We conclude that the Commission had no power to command discontinuance of price differentials reasonably based on quantity, and there is no finding which properly construed determines that those here involved are not so based, since no standard for the making of such finding is recognized.

The order of the respondent is set aside.

HAMILTON, Circuit Judge (dissenting).

I am unable to concur in the majority opinion. With all due regard to, and respect for, the legal ability of my associates, I believe they have included in the proviso of the statute a case that lies beyond its direct expression and not within its letter or spirit.

This statute should be construed in the light of attendant conditions and the state of the law at the time of its enactment and applied to carry out the intention and meaning of the legislature gleaned from its language. A proviso which operates to limit the application of the general provisions of a statute should be strictly construed to include no case not within its letter. The last rule is especially applicable to the case here under consideration.

A proviso may be used as a guide in the selection of one or the other of two possible constructions of words or phrases found in a statute doubtful in scope, but to read into it a meaning not comprehended by the enactment itself and contrary to its terms, makes it an instrument of discrimination and defeats, rather than clarifies, legislative intent.

Usually provisos find their way into statutes at the behest of persons who are unreasonably apprehensive as to their effect and by those who wish to obtain immunity from their terms. They are the favorite instrument of lobbyists and those who desire to escape the effect of general provisions of a statute applicable to a large class. Having put in a proviso which in many instances is needless, in order to satisfy the persistent and allay a particular class, courts are sometimes led to construe it as to relieve of liability those plainly within the scope of the statute and impose liability on those not so apprehensive of

its effect or so diligent to protect their interests.

The problem of monopolies has engaged the attention of organized society for centuries. The first regulatory statute was passed in England in 1624, making all illegal except such as might be authorized by Parliament in respect to new manufacturing enterprises carried on by corporations or companies. The proviso in this statute was used as an excuse for subsequent transgressions of the act and so it is that provisos have since been an avenue of evasion.

A private monopoly is indefensible and intolerable. To this principle all agree. The first Federal law on the subject was passed in 1890 (26 Stat. 209), 15 U.S.C.A. §§ 1–7, 15 note. It was designated An Act to Protect Trade and Commerce Against Unlawful Restraints and Monopolies and was passed as the result of widespread and vehement popular insistence that something be done to curb the growing tendency toward concentration of industry to the disadvantage of both the consumer and small producer. It declared illegal "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations," and that "every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States" violates the act. Sections 1, 2.

Efforts to eliminate restraints or attempted restraints of competition were carried on by the United States under this act for twenty-four years. Its success fluctuated with the courts' interpretation of what the words and phrases of the act meant. There was difficulty in applying such vague terms as "contracts in restraint of trade" and "attempts to monopolize" when the question arose as to the applicability of these terms to concrete situations. The tendency toward industrial concentration continued unabated which resulted in the disappearance of small units of production and brought forth two paradoxical types of economic restraint; one, no competition; the other, ruinous competition. President Wilson, in his message to the Sixty-third Congress, said: "We are sufficiently familiar with the actual processes and methods of monopoly and of the many hurtful restraints of trade to make defini-

tion possible, at any rate up to the limit of which experience has disclosed. These practices, being now abundantly disclosed, can be explicitly and item by item forbidden by statute in such terms as will practically eliminate uncertainty, the law itself and the penalty being made equally plain."

Such was the historic background and the motives which moved the framers of the legislation which was passed as The Federal Trade Commission Act, 15 U.S.C.A. § 41 et seq., and the Clayton Anti-Trust Act of 1914, 38 Stat. 730, which concerns us here. Johnson v. Southern Pacific Co., 196 U.S. 1, 22, 25 S.Ct. 158, 49 L.Ed. 363.

A study of the debates upon these measures in Congress clearly shows the intent to declare illegal all practices regarded as likely to promote monopolies thus forestalling an evil before its development.

During the course of the debates, Senator Walsh, of Montana, in referring to the Clayton Act, said: "The purpose of the legislation of which the pending bill forms a part is to preserve competition where it exists, to restore it where it is destroyed and to permit it to spring up in new fields." Congressional Record, Oct. 5, 1914,—Vol. 51, p. 16.

While the Federal Trade Commission Act and the Clayton Act were passed separately they were considered by Congress concurrently, reference to the other being frequently made in the course of the debates on each, and they should be understood as complementary attempts to promote our government's basic concept of economic equality.

In the Federal Trade Commission Act, the Congress attempted to set up a permanent body of trained personnel whose duty it was to safeguard and promote competition in industry. The companion Clayton law was entitled "An Act To supplement existing laws against unlawful restraints and monopolies, and for other purposes." Section 2 of the Act, U.S.C.A. 15, § 13, provides: "Sec. 2. [§ 13.] That it shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly to discriminate in price between different purchasers of commodities, which commodities are sold for use, consumption, or resale * * *: Provided, That nothing herein contained shall prevent discrimination in price between purchasers of commodities on account of differences in the grade, quality, or quantity of the commodity sold, or that

makes only due allowance for difference in the cost of selling or transportation, or discrimination in price in the same or different communities made in good faith to meet competition: And provided further, That nothing herein contained shall prevent persons engaged in selling goods, wares, or merchandise in commerce from selecting their own customers in bona fide transactions and not in restraint of trade."

Respondent found, and the facts conclusively show, that petitioner has violated the above section unless exempt under the proviso. Bearing in mind the rule of interpretation heretofore announced that the intention of the legislature is controlling, the single question in the case is what is meant by the expression "discrimination in price between purchasers of commodities on account of difference in grade, quality or quantity."

The Commission finds, and the undisputed evidence shows, there was no difference in grade or quality between the tires petitioner sold to its dealers generally and those sold to Sears-Roebuck & Company, so the single issue is the true construction of the phrase "on account of the difference in quantity." It is a rule of universal application that words or phrases in a statute must be construed to carry out the manifest intent of the Congress and in all cases they should be construed in the sense which best harmonizes with the context and promotes to the fullest extent the desired objective.

Every technical rule as to the construction or force of particular terms must yield to the clear expression of the paramount will of the legislature and the words and phrases of a statute will be construed in their ordinary sense, and with the meaning commonly attributed to them in the ordinary business affairs of life. Sproles v. Binford, 286 U.S. 374, 397, 52 S.Ct. 581, 76 L.Ed. 1167.

Excluding the proviso in the statute here, every discrimination in price between different purchasers is prohibited. It was not intended that the prohibition should be cancelled by the proviso. Such an interpretation would lead to an absurdity and if the rule of liberality applied in the majority opinion is applicable to the proviso, it sets up a method of evasion not intended by the Congress. For the reasons heretofore pointed out, a proviso must be strictly construed.

The Congress intended to maintain competitive prices, which means those resulting from the activities of many buyers and sellers, each of whom can affect the outcome only by buying or selling large or small quantities according as the price is at one point or another. It intended to proscribe monopoly prices which are those fixed with a view to the advantage of the purchaser or seller by a single (exclusive) seller or buyer or by a combination of sellers or buyers acting as a unit. Monopolistic prices are always possible when a seller is able to deal differently with the same classes of buyers of the same product or to manage in some other way to sell his goods in virtually separate markets. Recognizing this practice and in order to suppress monopolies at their inception, the Congress penalized sales of the same article to different customers at different prices.

If the contract between the petitioner and Sears-Roebuck falls within the definition of the term "monopolistic prices" above outlined, there is a violation of the act regardless of difference in quantity, because the transaction is what is commonly known in ordinary business affairs as fixing a discriminatory price and by a device having the monopolistic tendency denounced by the Clayton Act.

The rule to be followed in the construction of statutes relating to commercial transactions is that the descriptive terms applied to articles of commerce shall be understood according to the acceptation given them by commercial men doing business in our country at the time of the passage of the act in which they are found.

Under this rule the expression "discrimination in price between purchasers of commodities on account of difference in grade, quality or quantity of the commodity sold" must be construed in the light of business practices in this regard at the time of the passage of the act. The testimony in the record of those familiar with the industry shows that quantity discounts on account of tire purchases are relatively small and based upon certain definite and known volumes of purchases none of which have any resemblance to the transaction between petitioner and Sears-Roebuck & Company. This being true the acts of the petitioner bring it within the general provisions of the anti-trust laws and exclude it from the protection of the proviso therein.

628

The statutes here in question do not require the adventitious aid of subsequent kindred legislation for the purpose of elucidation. "In other words, where congress has expressly legislated in respect to a given matter, that express legislation must control, in the absence of subsequent legislation equally express, and is not overthrown by any mere inferences or implications to be found in such subsequent legislation." Rosecrans v. United States, 165 U.S. 257, 264, 17 S.Ct. 302, 304, 41 L.Ed. 708. It is the primary duty of courts to interpret the meaning of statutes and a resort to contemporaneous or executive construction is both unnecessary and improper where the language used is clear or its meaning can be ascertained by the use of intrinsic aids alone. Bates & Guild Co. v. Payne, 194 U.S. 106, 112, 24 S.Ct. 595, 48 L.Ed. 894; United States v. Missouri Pacific Railroad Co., 278 U.S. 269, 282, 49 S. Ct. 133, 73 L.Ed. 322.

The mere failure of public officers charged with the public duty to enforce statutes against odious monopolies or their acquiescence in the conditions that permit them to flourish should not be allowed to stand in the way of the administration of such laws or be construed to estop more diligent and efficient public officials when they attempt to terminate monopolistic practices and tendencies.

I am of the opinion the order of the Commission should be upheld.