**John W. WILKIE, Trustee in Bankruptcy for William S. Edgemon, Bankrupt, Plaintiff-Appellee,**

v.

**Kyle F. BROOKS et al., Defendants-Appellants.**

**No. 74–1026.**

United States Court of Appeals, Sixth Circuit.

April 17, 1975.

Louis A. Ginocchio, Cincinnati, Ohio, for appellant.

S. Arthur Spiegel, Cohen, Todd, Kite & Spiegel, Cincinnati, Ohio, for appellee.

Before EDWARDS and ENGEL, Circuit Judges, and GRAY,* District Judge.

ENGEL, Circuit Judge.

This is an appeal by defendants[1] from a judgment rendered upon a jury verdict in favor of the trustee in bankruptcy for William S. Edgemon, for $193,200, in an action alleging an illegal preference under § 60(b) of the Federal Bankruptcy Act [11 U.S.C. § 96(b)]. The complaint alleged that defendant Kelly received $125,000 in general obligation bonds and $30,000 in cash shortly before Edgemon's bankruptcy, that this "transfer" was made in violation of § 60 of the Bankruptcy Act and that Kelly should, therefore, be required to turn over the amount received to the trustee. At the conclusion of the proofs at trial, the district judge refused defendant's motion for a directed verdict and submitted the case to the jury which returned a verdict for the plaintiff trustee. On appeal, defendant assigns as error the refusal of the district judge to grant his motion for directed verdict and refusal to grant his subsequent motion for judgment notwithstanding the verdict. He also assigns as error the admission of certain hearsay evidence which he claims requires a new trial, and alleges there was insufficient proof of damages to support the amount of the jury verdict.

Because we conclude that the district court erred in denying defendant's motion for directed verdict, we do not reach the other issues raised by defendant on appeal.

The controversy arose out of the dealings of the defendant Kelly and the bankrupt, William E. Edgemon, in Florida in the 1950's and 1960's. In the early 1950's, Edgemon and his partner, Raymond Moss, purchased and had shipped to North Miami, Florida an 11th Century Spanish monastery which they then had incorporated as Monastery Gardens, Inc., and opened as a tourist attraction.[2] In 1961, Edgemon became sole owner of the shares in the corporation, buying out the other shareholders.

Later in 1961, Edgemon became indebted to defendant Kelly as a part of a deal involving land near Sarasota, Florida. As a result of this indebtedness, Edgemon and Kelly entered into a written agreement on May 31, 1962 by which Edgemon agreed to turn over the stock of Monastery Gardens, Inc. to Kelly. Under the agreement, if Edgemon failed to pay Kelly the full amount of the indebtedness by Sept. 1, 1962, Kelly was free to sell the stock. While the language of the agreement is couched in terms of outright transfer of the stock, it is clear that the parties intended that the transfer of stock constitute a security arrangement, since if Kelly were ever to sell the stock, Edgemon would get any amount received in excess of the debt owed and would conversely be liable for any deficiency if the stock was sold for an amount less than the amount of the debt. The agreement also authorized Kelly to elect a new board of directors of the corporation.

After the May, 1962 agreement was entered into, Edgemon continued to

---

*Hon. Frank Gray, Jr., Chief Judge, United States District Court for the Middle District of Tennessee, sitting by designation.

1. Kelly and Brooks are trustees of a trust set up for Kelly's benefit several years ago. After Kelly received certain stock from the bankrupt, William Edgemon, in 1962, he turned it over to the trust. Thus the proceeds of the sale of the Monastery Gardens, Inc. stock, the subject of the alleged preference, were received by Kelly and Brooks as trustees for Kelly. Hereinafter, references to defendant will refer to Kelly.

2. The monastery was originally owned by William Randolph Hearst who had acquired it in Spain and had it shipped to this country. The monastery was stored in a warehouse during the depression and purchased by Edgemon and his partner Moss from Hearst's estate in the early 1950's.

serve in his capacity as President of the corporation until its liquidation in December, 1966. During this period, he apparently had full control of the corporation with Kelly taking only a passive role in running the corporate affairs. In August, 1964, Edgemon made a second and obviously fraudulent transfer of his stock interest in the corporation to a James Ulrick to secure a personal debt owed by Edgemon to Ulrick. Later in that year, Edgemon began negotiating with the St. Bernard Association, a non-profit corporation formed by the Episcopal Diocese of South Florida, for the sale of Monastery Gardens, Inc. Edgemon, by letter, informed Kelly of these negotiations.

In December of 1964, Edgemon, purporting to act in the capacity of owner and president of Monastery Gardens, Inc., entered into an agreement with the St. Bernard Foundation for the sale of the assets of the corporation. Under the terms of the agreement, the Ulrick mortgage was paid off out of an initial $350,-000 paid by the Foundation. In addition, the Foundation was to later pay an additional amount of between $225,000 and $400,000 for the corporation, depending on the success of a fund-raising campaign. The Foundation also retained the option to cancel the contract.

Kelly apparently never knew of the Ulrick mortgage and first learned of the sale of the corporation in June, 1965. About a year later, Kelly, through his lawyers, began to press the St. Bernard Foundation to close the transaction entered into under the 1964 agreement by the end of 1966, five months earlier than the original agreement called for. The Foundation's fund-raising program had not gone well and Kelly agreed to settle for $125,000 in bonds of the Episcopal Diocese of South Florida and $55,000 in cash, $45,000 less than the 1964 written agreement had called for. A closing was held on December 28, 1966. At this closing, Kelly received $110,000 of the general obligation bonds and $30,000 in cash allegedly for his stock interest in the corporation. Shortly thereafter in Janu-

ary 1967, Edgemon filed a voluntary petition in bankruptcy. After appointment of the trustee and his discovery of the foregoing transactions, the trustee in bankruptcy demanded that Kelly return the bonds and cash. When Kelly refused, this action was commenced.

The main issue raised on appeal is the claim that the district judge erred in refusing to grant the defendant's motion for a directed verdict at the end of the evidence. Our standard of review of a denial of such a motion is clear:

"To determine whether a directed verdict is appropriate the governing principle is that a verdict may properly be directed only when, without weighing the credibility of the witnesses, there can be but one reasonable conclusion as to the verdict . . . An appellate court too is bound to view the evidence in the light most favorable to the party against whom the motion for a directed verdict is made and give him the advantage of every fair and reasonable inference that the evidence may justify." Fortner Enterprises, Inc. v. United States Steel Corp., 452 F.2d 1095 (6th Cir. 1971).

■ In cases involving an alleged illegal preference under § 60 of the Bankruptcy Act, the burden of proof is on the trustee to prove each element of the preference as defined in § 60. First National Bank of Negaunee v. Fox, 111 F.2d 810 (6th Cir. 1940); 3 Colliers on Bankruptcy p. 1123. Section 60(a)(1) of the Bankruptcy Act, 11 U.S.C. § 96(a)(1) provides:

"Preferred creditors

(a)(1) A preference is a transfer, as defined in this title, of any of the property of a debtor to or for the benefit of a creditor for or on account of an antecedent debt, made or suffered by such debtor while insolvent and within four months before the filing by or against him of the petition initiating a proceeding under this title, the effect of which transfer will be to enable such creditor to obtain a great-

er percentage of his debt than some other creditor of the same class."

Although appellant Kelly contends that the trustee failed to meet his burden of proof on several of the requisite elements of the preference, the key issue here is whether the trustee has proved that the "transfer" occurred within four months of bankruptcy. Kelly contends that the transfer occurred in 1962 when the stock certificates and record were transferred to him following execution of the May 31, 1962 agreement. The trustee, on the other hand, contends that the transfer did not occur until Kelly perfected his security interest by obtaining the cash and bonds in December of 1966. This date, if controlling, would place the transfer within the four month period, and hence, render it voidable at the suit of the trustee. Additionally, the trustee claims that even if it was shown that Kelly's interest in the stock was perfected, under Florida law he was estopped from asserting the claim by negligently permitting Edgemon to appear for all intents and purposes as owner of the corporation.

Section 60(a)(2) of the Bankruptcy Act [11 U.S.C. § 96(a)(2)] provides:

> "For purposes of subdivision (a) and (b) of this section, a transfer of property other than real property shall be deemed to have been made or suffered at a time when it became so far perfected that no subsequent lien upon such property obtainable by legal or equitable proceedings on a simple contract could become superior to the rights of the transferee. . . ."

It therefore becomes necessary to determine whether Kelly's interest in the stock ever became "so far perfected"

that no subsequent lien obtained on a simple contract could become superior to that of Kelly, and if so, whether this occured within four months of Edgemon's bankruptcy.

■ On oral argument before this court, counsel for both parties acknowledged that under Florida law a security interest in stock may be perfected by transfer of the endorsed certificates by the pledgor to pledgee. This is currently the law in Florida under Fla.Stats. 679.-9–305.[3] Under that section of the Florida Uniform Commercial Code, a security interest in stock is perfected by possession alone. Cf. Schulz v. Schulz, 478 S.W.2d 239 (Tex.Civ.App.1972) wherein the Texas Court of Civil Appeals, interpreting the identical provision of the Texas Uniform Commercial Code, held that a perfected security interest in stock could be created by taking possession of the stock alone.

■ We realize that the Florida Uniform Commercial Code, § 679.9–305, is not applicable to this case since it was enacted subsequent to the time the alleged pledge of stock occurred. However, we think it is instructive that the framers of the Florida U.C.C. did not perceive that they were in any way changing the prior law of pledge applicable in Florida, but merely codifying that law. The Florida Code Comments, published by then Assistant Attorney General Sam G. Harrison, Jr., one of the chief framers of the Florida code, state the legislative intent thus:

> "This section retains the common law rule of perfecting a security interest by possession, followed in Florida. Spellman v. Beeman, 70 Fla. 575, 70 So. 589."

3. § 679.9–305 A security interest in letters of credit and advices of credit [§ 675.5–116(2)(a)] goods, instruments, negotiable documents or chattel paper may be perfected by the secured party's taking possession of the collateral. If such collateral other than goods covered by a negotiable document is held by a bailee, the secured party is deemed to have possession from the time the bailee received notification of the secured party's interest. A security interest is perfected by possession from the time possession is taken without relation back and continues only so long as possession is retained, unless otherwise specified in this chapter. The security interest may be otherwise perfected as provided in this chapter before or after the period of possession by the secured party.

■ Although Florida case law on the perfection of pledges of stock prior to enactment of the U.C.C. is scarce, it appears that Florida followed the common law rule that delivery of the endorsed stock certificates constituted a perfected pledge. In Landy v. Nicholas, 221 F.2d 923 (5th Cir. 1955), the Fifth Circuit in a case applying Florida law stated:

"Stock certificates, insurance policies, and savings bank books may be the subject of pledges by delivery alone." 221 F.2d at 929.

■ Viewed in the light most favorable to the trustee, we conclude the evidence is nevertheless overwhelming that the transfer of the certificates took place in 1962 as alleged by defendant. First, Edgemon himself testified that the transfer of certificates occurred in 1962. Brooks also testified that the agreement of May 31, 1962 was carried out. Finally Kelly testified that a physical transfer of the stock certificates took place in 1962. In addition, documentary evidence introduced at trial indicates the transfer took place as alleged. For example, plaintiff's exhibit # 76, a letter from Edgemon to Kelly dated February 3, 1965, indicates that the stock certificates and company books had already been transferred to Kelly and that Edgemon would like them back sometime if he was able to pay off the indebtedness that he owed Kelly.

While not disputing that all of the direct testimony indicates that the transfer of the certificates took place in 1962, the trustee nevertheless asserts that the jury was not required to believe it, citing Goldman v. CIR, 388 F.2d 476 (6th Cir. 1967), Lakewood Manufacturing Co. v. CIR, 453 F.2d 451 (6th Cir. 1972), Andrew Jergens Co. v. Conner, 125 F.2d 686 (6th Cir. 1942), Goodyear Tire and Rubber Co. v. FTC, 101 F.2d 620 (6th Cir. 1939).

Goldman and Lakewood Manufacturing, supra, were tax cases in which appellants argued that the tax court had erred in rejecting unrebutted testimony of the taxpayer. We find Goldman to have no relevance here, since in that case there was conflicting evidence on the key issue of the fair market value of certain gifts made by taxpayer to a charitable organization. In Lakewood, supra, the key issue was the reasonableness of compensation paid to the president of a closely held family corporation. This court upheld the tax court determination that the salary paid to the president was unreasonable, although the only testimony on this issue was that of the taxpayer's witnesses. The court properly determined that the ultimate fact question of reasonableness should be determined from all the evidence, including corporate earnings, dividends, and the duties actually performed by the president and other company personnel.

Goodyear Tire & Rubber Co. v. FTC, supra, involved review of an FTC cease and desist order charging Goodyear and Sears with price discrimination in violation of § 2 of the Clayton Act. A corporate officer testified that the price differentials in question had been made in good faith, and this testimony was not controverted or impeached. The court, in dicta, stated that such testimony, though uncontroverted, might be rejected by analysis of the evidence as a whole.

Andrew Jergens Co. v. Conner, supra, involved the alleged overpayment of excise taxes by the taxpayer. Again, the taxpayer was the only witness to testify as to whether he had paid the tax or passed it on to customers. The court held that taxpayer's very general testimony, though uncontradicted, was not the type of "very clear and decisive evidence" which taxpayer was required to present to meet his burden of proof.

We do not believe that the cases cited by the trustee support his contention that the jury here was free to reject the uncontradicted testimony which was offered at trial. In this case a contract was introduced into evidence which indicated that the transfer of stock certificates was part of the 1962 agreement of

Edgemon and Kelly. Three witnesses, Edgemon, Kelly, and Brooks, testified that the agreement was consummated and that the transfer of stock certificates took place as called for under the agreement. This testimony was uncontradicted, although testimony of Edgemon and Kelly on other matters was impeached. In addition, certain documentary evidence introduced at trial supported the contention that the stock transfer took place in 1962.

■ We think that these factors serve to distinguish the cases cited by the trustee. Unlike *Goldman* or *Lakewood*, the testimony offered here was not simply the opinion of a witness on an ultimate fact issue such as "reasonableness" or "fair market value". Rather it was testimony as to *facts* which occurred and which were within the knowledge of the witnesses. In addition, this case differs from the *Andrew Jergens Company* case in that here appellant did not have an extraordinary burden of proof to meet in order to sustain his position. Finally, unlike the suggestion in *Goodyear*, the evidence here taken as a whole in no way contradicts the testimony offered by the witnesses in question. Rather the evidence taken as a whole is consistent therewith. We think that the evidence presented here was the kind of "clear, convincing and uncontradicted testimony" which, when supported by the other evidence introduced at trial, could not be rejected by the jury. Southeastern Canteen Co. v. CIR, 410 F.2d 615 at 624 (6th Cir. 1969).

The trustee also relies upon certain evidence elicited at trial which, if it does not contradict the direct testimony concerning the 1962 transfer of stock, nevertheless creates grave doubt that such agreement was ever completed, and justifies the jury's rejection of the direct

proof to the contrary concerning the transfer.

■ Specifically, the trustee notes that certificate No. 15 delivered to Kelly contained the forged signature of Hayes, Secretary of the corporation.[4] Under Florida Statutes § 608.41, each stock certificate issued by the corporation must be signed by the president or vice president *and* signed by the secretary or treasurer of the corporation. If the secretary's signature was a forgery, then certificate No. 15 would be invalid.

■ Our conclusion that all of the evidence indicates that the "transfer" for purposes of § 60 took place in 1962 does not hinge upon the validity or invalidity of certificate No. 15. Kelly obtained a perfected security interest in the stock by taking possession of the certificates previously issued to Edgemon and endorsed by him. Assuming that Kelly may have been the victim of a forgery, this does not affect the security interest he had in the valid and endorsed certificates.

In addition, the trustee notes that although the 1962 agreement called for Kelly to elect a board of directors, the evidence was in conflict as to whether he ever did so. Further, the evidence indicated that Kelly failed ever to file certain corporate reports which the trustee argues, under Florida law, he was required to file. F.S.A. § 608.32.

We do not perceive any of the facts cited by the trustee, even when taken as completely true, as sufficient to support a finding by the jury that the transfer of stock did not take place as was testified. While the facts cited by the trustee indicate that Kelly did not take an active interest in the affairs of the corporation after receiving the pledge of

---

4. Certificate No. 15 purported to represent 1,000 shares of Monastery Gardens, Inc. stock issued to Kelly by the corporation. It was signed by Edgemon as president of the corporation and by Hayes as secretary, although the Hayes signature was an apparent forgery.

The certificate was transferred to Kelly by Edgemon along with the stock certificates previously issued to Edgemon and endorsed over to Kelly pursuant to their May, 1962 agreement.

stock in 1962, this is not inconsistent with his position as a secured creditor.

The jury could believe that Kelly never exercised his right under the 1962 agreement to elect a board of directors, or if he did elect a board, that he never exercised control over the management of the corporation. In addition, the jury could believe that Kelly never caused to be filed any of the annual reports which § 608.32 requires the corporation to file. However, these facts are not inconsistent with Kelly's position as a secured creditor and in no way impeach the testimony that the transfer of certificates took place in 1962. That Kelly never exercised his right of control over the corporation by electing a board of directors to protect his interests does not diminish the security interest he already had through possession of the stock in the company. There was no credible evidence from which the jury could conclude that the transfer of the certificates did not take place in 1962 as testified to by several witnesses. Thus, absent an issue of estoppel or waiver, the verdict in favor of the trustee must be reversed since he had failed to prove an essential element of his cause of action.

The trustee's "estoppel theory" is summarized in his brief as follows:

"Assuming, which we deny, that Kelly became a secured creditor of Edgemon under the terms of the 1962 agreement, his negligence in permitting Edgemon to appear as owner of the corporation, and not perfecting his position until he actually got possession of the securities and cash at the closing on December 28, 1966, under the doctrine of estoppel and waiver places the 'transfer' at the latter date."

We accept as a correct statement of Florida law, the definition of equitable estoppel used by the Fifth Circuit in Minerals and Chemicals Phillip Corporation v. Milwhite, Co., 414 F.2d 428 (5th Cir. 1969), citing the Florida cases of Aetna Casualty and Surety Co. v. Simpson, 128 So.2d 420 (D.C.A.Fla. 1961) and Richards v. Dodge, 150 So.2d 477 (D.C.A.Fla.1963). In Minerals, the Fifth Circuit, quoting from Aetna, stated the Florida doctrine of estoppel as follows:

"The essentials of equitable estoppel are (1) words and admissions, or conduct, acts and acquiescence, or all combined causing another person to believe in the existence of a certain state of things, (2) in which the person so speaking, admitting, acting or acquiescing did so wilfully, culpably, or negligently, and (3) by which such other person is or may be induced to act so as to change his own previous position injuriously. The parties sought to be estopped must be guilty of conduct which amounts to . . . concealment of material facts at a time when he has knowledge, actual or constructive, of the real facts."

In asserting that Kelly was chargeable with "[the] failure to speak when under some duty to speak", Richards v. Dodge, supra, 150 So.2d at 481, plaintiff relies upon Florida Statute 608.32(1) [5] which

---

**5.** 608.32 Annual report of corporation; contents

(1) All corporations heretofore or hereafter incorporated in this state and all foreign corporations heretofore or hereafter authorized to do business in this state are required to file with the secretary of state on or before July 1st of each year a sworn report, on such form as the secretary of state shall prescribe, giving (a) the name of each officer and director and his post office address, (b) the home office of the corporation, (c) the name and address of the resident agent upon whom service of process may be made, (d) the main line of business engaged in by the corporation, (e) the date of the last meeting of its board of directors, (f) whether the corporation has been actively engaged in business during the previous twelve months or if its charter powers have been dormant and unused during that period, (g) the number of the shares of the capital stock of such corporation with the par value thereof, (h) the total amount of capital stock, and if a foreign corporation the amount of its capital stock allocated for use in the state, (i) such other information as may be needed to show whether the corporation is active or inactive, and (j) such other information as may be necessary for the secretary of state to have in

imposes upon corporations in Florida a duty to file with the Secretary of State an annual report giving the name of each officer and director of the corporation and his address. Under § 608.34 [6] of the Florida Statutes, such a report becomes a public record. Plaintiff alleges that even assuming that Kelly became the owner or pledgee of the stock in 1962, as a director of the corporation with control over it, he had a duty to file the annual report called for by § 608.32. Plaintiff urges that Kelly's failure to perform this duty should estop him from asserting any security interest in the corporation until the 1966 closing. We cannot agree.

Ordinarily a pledgee of stock is under no obligation to make known to anyone his interest in the stock pledged by filing a financial statement or otherwise. See Uniform Commercial Code Comment Fla.Stat. 679.305. Possession of the stock is considered sufficient notice to other creditors of his interest. Here, however, Kelly became more than a mere pledgee of the stock under the 1962 agreement. Under that agreement, he had the right to elect a board of directors to run the corporation. While he had this right under the agreement, and does in fact claim to have elected a board of directors, it is not disputed that Edgemon continued to run the corporation with Kelly assuming a passive role.

Neither party has cited any relevant legislative history to aid us in deciding whether Fla.Stat. § 608.32 can be said to impose upon Kelly a "duty to speak" in this situation.

While no doubt one purpose of this cited Florida statute is the pro-tection of creditors of the corporation, we fail to see how it has anything to do with protection of the creditors of a stockholder. As a pledgee, Kelly did all that was required by Florida law to perfect his security interest and give other creditors notice thereof. No creditor of Edgemon could have been misled as to Edgemon's claimed ownership of the corporation if he had asked to see the certificates of stock, since they were in Kelly's possession. Any liability of Kelly as a director of the corporation for failure to comply with Fla.Stat. § 608.32 does not concern us here. Even assuming that Kelly possessed the right under the agreement to take a more active role in the corporation affairs, and assuming further a breach of his statutory duty toward the corporation, we are cited no authority to suggest that Kelly had a duty to give notice to anyone of his lien on the Edgemon stock beyond that implicit in his possession of it. We, therefore, conclude that the estoppel theory was not applicable upon the proofs in the case and that it should not have been submitted to the jury.

Accordingly, because the trustee has failed as a matter of law to prove that the "transfer" for purposes of § 60 took place within the four-month period prior to bankruptcy, the judgment of the district court must be reversed and the case remanded for entry of judgment for defendant.

EDWARDS, Circuit Judge (dissenting).

With great respect for the opinion of the court, I nonetheless dissent from setting aside the verdict of the jury. The opinion of the court is a clear, thorough

carrying out the provisions of this section and § 608.33.

**6.** 608.34 Duties of secretary of state

The secretary of state shall prescribe the form and furnish the blanks upon request to make the annual reports called for in § 608.32, examine the reports when received and if the information called for is given in such reports, he shall file the same as information and keep such reports as public records. He shall pay into the state treasury to be used for such purposes as the legislature may determine all moneys collected under the provisions of § 608.33. He shall cause a notice of the requirements of §§ 608.32, 608.33, to be mailed to the last known address of every corporation doing business in the state which shall fail to file within thirty days after July 1st, the report required by § 608.32 or pay the capital stock tax imposed by § 608.33. Added Laws 1953, c. 28170, § 1.

and accurate statement of Florida's law (applicable to this contract) relative to transfer of ownership of stock and relative to the doctrine of estoppel. But a review of the District Judge's charge convinces me that he, too, understood the applicable Florida law and provided the jury with all of the essentials of that law which were necessary to their decision.

The real question, as I see the matter, is whether this record is (as the court's opinion appears to hold) devoid of evidence to support plaintiff's claims 1) that the transfer of the bankrupt's interest in Monastery Gardens, Inc., to defendants took place within four months of bankruptcy and when defendants knew or should have known he was bankrupt, or 2) that defendants' conduct in leaving the bankrupt in absolute control of the property misled other creditors to their detriment so as to estop defendants from relying upon the defense of their asserted 1962 title to the stock.

Our question on review of the District Court's denial of a directed verdict is whether the factual record so overwhelmingly points to a conclusion favoring defendants that reasonable minds cannot disagree. 5A J. Moore, Federal Practice ¶ 50.02[1], at 2320–30 (2d ed. 1974). The Supreme Court has also stated the standard of review thus in Continental Ore Co. v. Union Carbide & Carbon Corp.:

> The Court of Appeals was, of course, bound to view the evidence in the light most favorable to Continental and to give it the benefit of all inferences which the evidence fairly supports, even though contrary inferences might reasonably be drawn.[6]

Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 696, 82 S.Ct. 1404, 1409, 8 L.Ed.2d 777 (1962).

But here the assets which were transferred to defendants (admittedly within four months of the bankruptcy petition) were assets paid by a third party to the bankrupt as president of Monastery Gardens, Inc., and this transaction was completed in this form with defendants' full knowledge and consent. In addition, clearly defendants permitted the bankrupt successfully to pose as both the president and the owner of the Monastery Gardens, Inc., thus enabling the bankrupt to divert corporate assets through at least one obviously fraudulent transaction in order to satisfy the bankrupt's personal obligation and also to do business with the appearance of affluence with others, including some of the current claimants in this bankruptcy proceeding.

While the cold written record which we review as an appellate court may be read as favoring defendants, I cannot escape the force of the propositions that our system of law provides for resolution of fact disputes by juries, that it is a jury's prerogative to determine the credibility of witnesses, and that a jury verdict should not be set aside if there is evidence (including inferences from evidence) which supports the verdict.

I would affirm the judgment.

---

**6.** As Professor Moore has indicated, "In ruling on the motion [for directed verdict] the trial court views the evidence in the light most favorable to the party against whom the motion is made. On appeal, likewise, the appellate court must consider the evidence in its strongest light in favor of the party against whom the motion for directed verdict was made, and must give him the advantage of every fair and reasonable intendment that the evidence can justify." 5 Moore's Federal Practice 2316 (2d ed., 1951). See Pawling v. United States, 8 U.S. 219, 4 Cranch 219, 2 L.Ed. 601; Gunning v. Cooley, 281 U.S. 90, 50 S.Ct. 231, 74 L.Ed. 720; Tennant v. Peoria &. P. U. R. Co., 321 U.S. 29. Cf. Smith v. Reinauer Oil Transport, 256 F.2d 646, 649 (C.A. 1st Cir.).